**Rakesh K. KAUL, Plaintiff,**

v.

**HANOVER DIRECT, INC., Defendant.**

**No. 01 CIV. 6810(DC).**

United States District Court, S.D. New York.

Jan. 7, 2004.

508

White & Case LLP, by Glenn M. Kurtz, Esq., M. Victoria Bayoneto, Esq., New York, NY, for Plaintiff.

Brown, Raysman, Millstein, Felder & Steiner LLP, by Catherine M. McGrath, Esq., Joel L. Finger, Esq., Edward Copeland, Esq., Tara Stein, Esq., New York, NY, for Defendant.

## OPINION

CHIN, District Judge.

In this case, plaintiff Rakesh K. Kaul, the former President and Chief Executive Officer of defendant Hanover Direct, Inc. ("Hanover"), sues the company he once headed to recover compensation that he claims should have been paid to him under various employment agreements and benefit plans. Before the Court are three motions: (1) Hanover's motion for summary judgment dismissing all of Kaul's claims and in its favor on a counterclaim for monies purportedly owed by Kaul, (2) Kaul's motion for partial summary judgment striking certain of Hanover's affirmative defenses and counterclaims, and (3) Hanover's motion for reconsideration of this Court's order denying Hanover leave to amend its answer and counterclaims.

For the reasons that follow, the three motions are granted in part and denied in part.

## STATEMENT OF THE CASE

### A. The Facts

The principal facts are not in dispute, and I have noted the disagreements where they exist.

### 1. Kaul's Employment With Hanover

Hanover is a direct marketing company that sells merchandise to consumers through catalogues and the internet. Kaul served as its President and Chief Execu-

tive Officer from March 7, 1996 through December 5, 2000.

On or about March 7, 1996, Hanover and Kaul entered into an employment agreement to govern the terms and conditions of Kaul's employment (the "1996 Agreement"). (McGrath Decl., Ex. 6). As expressly stated in the 1996 Agreement, Kaul was hired as "an employee 'at will,'" and his employment could be terminated "for cause" or "other than for 'cause.'" (1996 Agreement §§ 1, 1(a), 1(b)).

In early April 2000, the 1996 Agreement was superseded by an employment agreement executed by Hanover and Kaul dated as of March 6, 2000 (the "Agreement"). The Agreement provided for a 36-month period of employment at a base salary of $597,300 per annum, subject to annual review but not to be decreased below that amount. (Agreement §§ 1, 3) (attached to McGrath Decl. as Ex. 7). It also provided for certain benefits and incentives. (*Id.* §§ 4, 5, 6). The Agreement provided that the employment period could be extended for 12 months in certain circumstances. (*Id.* § 1). The Agreement also provided that Kaul's employment could be terminated with or without cause. (*Id.* § 7).

In December 2000, the Board of Directors of Hanover (the "Board") decided to terminate Kaul's employment. (Quasha Dep. at 99–101, 103) (McGrath Decl., Ex. 16). Hanover contends (and Kaul denies) that the Board made this decision because the company had "net cumulative losses of approximately $225 million under his stewardship." (Def. SJ Mem. at 1).[1] On December 5, 2000, Alan G. Quasha, the Chairman of the Board, informed Kaul of the Board's decision. (Quasha Dep. at 114–17). Kaul resigned, with the understanding that the Board would treat his resignation as a termination without cause for purposes of the Agreement. (*Id.* at 115–16; McGrath Decl., Ex. 20; Harriss Dep. at 211–12, 279–80 (McGrath Decl., Ex. 36)).

### 2. *Kaul's Claims*

Kaul asserts essentially five claims (or sets of claims), based on the following: (a) § 7(b) of the Agreement, which provides for certain benefits in the event of termination; (b) § 12 of the Agreement, which provides for attorneys' fees; (c) a long-term incentive plan, which provided for bonuses to be paid to Kaul to enable him to purchase Hanover stock; (d) a change of control plan that provided Kaul with certain compensation if his employment were terminated following a change of control of Hanover; and (e) vacation pay. I review the facts relating to each of these claims.

### a. *§ 7(b) of the Agreement*

Section 7 of the Agreement covered termination. It provided, in part:

> In the event of a termination of [Kaul]'s employment during the Employment Period except in connection with or following a Change of Control as such term is defined in the Hanover Direct, Inc. Key Executive Thirty–Six Month Compensation Continuation Plan ..., he shall be entitled to compensation and benefits on and after the date of such termination only as provided in this Section 7, the 2000 Short–Term Plan and the 2000 Long–Term Plan and under the terms of any prior agreement still in effect on the date of termination as set forth in Section 10, or pursuant to the

---

1. References to "Def. SJ Mem." and "Pl. Opp. Mem." are to, respectively, Hanover's memorandum of law in support of its summary judgment motion and Kaul's memorandum of law in opposition thereto. References to "Pl. SJ Mem." and "Def. Opp. Mem." are to, respectively, Kaul's memorandum of law in support of his motion for partial summary judgment and Hanover's memorandum of law in opposition thereto.

terms of any benefit plan maintained by [Hanover] and in which [Kaul] is a participant or a beneficiary at the time of his termination.

(Agreement § 7). The Agreement then set forth the parties' agreement with respect to the termination of Kaul's employment by Hanover for cause (§ 7(a)), by Hanover without cause or by Kaul for good reason (§ 7(b)), or as the result of Kaul's death or disability (§ 7(c)).

Pursuant to § 7(b), if Hanover terminated Kaul's employment without cause, he was entitled to, *inter alia,* the continuation of his salary and benefits for 24 months as well as certain bonuses. These payments and benefits, however, were subject to § 7(g), which provided:

> In order to be eligible for the payments and benefits as set forth in Section 7(b), (i) [Kaul] must execute and deliver to [Hanover] a general release in favor of [Hanover], excepting statutory contribution and indemnity rights to which [Kaul] is entitled, and (ii) [Kaul] must be and remain in material compliance with his obligations under the Non–Competition and Confidentiality Agreement.

(*Id.* § 7(g)).

As discussed below, the parties never agreed on the terms of a "general release." Hanover did pay, however, $341,803 in severance benefits to Kaul following his dismissal even though he did not provide a release. (*See* Def. Countercl. ¶ 38).

> The Agreement also provided:
> This Agreement and attachments hereto constitute the entire Agreement between the parties pertaining to the subject matter contained herein and supersede all prior and contemporaneous agreements, representations and understandings of the parties with respect to the subject matter hereof, including without limitation, the [1996 Agreement].... Notwithstanding the foregoing, this Agreement shall have no effect

on and shall not supercede the following agreements: Registration Rights Agreement, dated as of August 23, 1996, between [Hanover] and [Kaul]; Tandem Loan in the principal amount of $1,047,562, payable to [Hanover]; Tax Note due August 23, 2001 in the principal amount of $211,729, payable to [Hanover]; [and other specified agreements].

(Agreement § 10).

The Agreement also provided that it was to be "construed and enforced" in accordance with New Jersey law. (*Id.* § 13).

**b. § 12 of the Agreement**

The Agreement provided for Hanover to pay Kaul's attorneys' fees in certain circumstances:

> [Hanover] shall pay [Kaul]'s reasonable legal fees in full in the event that he must seek legal counsel to enforce any of his rights under this Agreement, provided that before he retains legal counsel he must notify [Hanover] of any alleged failure to abide by the terms of this Agreement and, to the extent the matter is subject to cure, provide [Hanover] with a reasonable opportunity to cure.

(*Id.* § 12).

By letter dated December 19, 2000, Kaul wrote to Hanover confirming that he had retained counsel to represent him "in connection with the termination of [his] employment," and setting forth his understanding that Hanover had agreed to reimburse him for his legal expenses. (Bayoneto Decl., Ex. 3). Thereafter, Hanover paid Kaul's attorneys $36,964.93 in fees and expenses, for the periods ending December 31, 2000, and January 31, 2001, in connection with the termination of his employment. (*Id.,* Ex. 5).

### c. The Long–Term Incentive Plan

The 1996 Agreement provided for Kaul to participate in a "Long–Term Incentive Plan" (the "LTIP"). (1996 Agreement § 5). The LTIP was set forth in a document attached to the 1996 Agreement. The LTIP was intended "to promote an alignment" of Kaul's interests with Hanover's interests. (LTIP § 1). The LTIP gave Kaul the right to purchase a substantial number of shares of Hanover common stock on favorable terms. The concept was that with a significant equity interest in the company, Kaul would have a personal stake in Hanover's success and the performance of its stock.

The LTIP provided for a "Tandem Stock" bonus. Pursuant to § 5(a), Kaul was given the right to purchase shares of common stock at fair market value, with Hanover paying Kaul bonuses to cover the purchase price. Kaul was to pay 20% of the purchase price in cash, with the remaining 80% to be financed through a nonrecourse promissory note (the "Note") to be paid in four annual installments, each in the amount of 20% of the purchase price plus accrued interest. Hanover agreed to pay bonuses to Kaul to cover both the initial 20% cash payment and the subsequent four installments, including accrued interest. (See Am. Compl. ¶¶ 24–27; Lipner Dep. at 39 (McGrath Decl., Ex. 27)). As set forth in § 5(a):

> Twenty percent of the purchase price for such shares shall be paid in cash, and 80% shall be financed with a nonrecourse Note.... [Hanover] shall pay [to Kaul] on or before the date of such purchase a sign-on bonus equal to the portion of the purchase price required to be paid in cash, and shall pay [Kaul], on or before each due date ... of any payment of principal and/or interest on the Note, a bonus equal to the amount of such principal and/or interest then due. (LTIP § 5(a)).

On August 23, 1996, Kaul exercised his right under the LTIP to purchase 1,510,000 shares at a total price of $1,745,937.50. He was required to make a cash payment of 20%, or $349,187.50. As provided in the LTIP, Hanover made a book entry recording a bonus payment to Kaul in that amount, which Hanover applied to satisfy Kaul's obligation to pay in cash 20% of the purchase price of the stock. This book entry resulted in personal tax liability to Kaul, as the "bonus" constituted income to Kaul. Kaul paid this tax liability himself. (See Am. Compl. ¶ 28; Lipner Dep. at 9–19).

On August 22, 1997, Kaul was obligated to make the first of the four 20% payments under the Note, in the amount of $349,187.50. With accrued interest, he owed a total of $445,786.73. The same procedure was followed: Hanover made a book entry reflecting a bonus payment to Kaul in that amount, which was then applied to pay the principal and interest due under the Note. (See Am. Compl. ¶ 30; Lipner Dep. at 13; Kingsford Decl., ¶ 1).

In late 1997 or early 1998, however, to avoid the tax liability that he would incur as a result of the payment of the "bonuses" to be used to satisfy the Note obligations, the Note was amended to provide for a single balloon payment at maturity of principal and interest, and the maturity date was extended to August 23, 2001. (Kaul Dep. at 172–75 (McGrath Decl., Ex. 38); Lipner Dep. at 17–20; Am. Compl., Ex. C; Kingsford Decl. ¶ 2).

The August 22, 1997 "bonus" created personal income tax liability for Kaul in the amount of $211,729, which Hanover paid to the Internal Revenue Service (the "IRS") on Kaul's behalf. Hanover loaned this amount to Kaul by adding $211,729 to

the principal of the amended Note. (Kaul Dep. at 171–73 (McGrath Decl., Ex. 38); Kingsford Decl. ¶ 2).

As discussed below, Kaul's employment with Kaul was terminated on December 5, 2000. The Note provided that:

> [Kaul] shall prepay the entire unpaid principal amount of this Note together with interest accrued on such principal amount to the date of prepayment without premium ... on the thirtieth day following termination of [Kaul]'s employment with [Hanover] for any reason other than [death or long-term disability].

(McGrath Decl., Ex. 6 at HDI 03085; *see* Bayoneto Decl., Ex. 10).

On December 31, 2000, Hanover recorded a book entry payment to Kaul in an amount equal to the principal and interest then due on the amended Note, $1,277,561.42. Hanover then applied that amount on Kaul's behalf to satisfy the amended Note, except for the additional amount that had been loaned to Kaul to pay the IRS, $211,729.08, plus interest. (Kingsford Decl. ¶ 3). In other words, even though Kaul was no longer employed by Hanover, Hanover nevertheless "paid" him a bonus in an amount sufficient to cover the outstanding principal and interest due on the amended Note, with the exception of the $211,729.08 plus interest.

On January 10, 2001, however, Kaul contacted Hanover and requested that it reverse the payroll entry. (*Id.* ¶ 5 & Ex. 1 ("I ... would appreciate a confirmation of a reversal of the payroll entry....")). As Hanover's tax advisors explained, a "payment" of the Tandem Bonus to Kaul would generate substantial personal income tax liability, while no such tax liability would result if Kaul surrendered his shares in full satisfaction of the amended Note in lieu of receiving the bonus. (*Id.* ¶ 7). Moreover, because the value of the shares had dropped considerably, with the latter

option Kaul would receive a tax benefit in the form of a long term capital loss. (*Id.*).

Hanover gave Kaul the option of "receiving" the Tandem Bonus and retaining the shares or surrendering the shares in satisfaction of the amended Note (except for the $211,729.08 plus interest) in lieu of the bonus. Kaul elected to surrender the shares. (*Id.* ¶¶ 8, 9; Shull Decl. ¶¶ 2, 3; Pl. Opp. Mem. at 11–14 (acknowledging that Kaul tendered his shares)).

#### d. *The Change of Control Plan*

Effective December 26, 1999, Hanover established a "Key Executive Thirty–Six Month Compensation Continuation Plan" (the "Plan"). (McGrath Decl., Ex. 9). Kaul was the sole participant in the Plan. (*Id.* § 2.9). By its terms, the Plan was intended "to attract and retain key management personnel by reducing uncertainty and providing greater personal security in the event of a Change of Control." (*Id.* § 1.1). The events constituting a Change of Control were defined in § 2.2 of the Plan. (*Id.* § 2.2). The Plan provided that "prior to a Change of Control the participation in the Plan of any Participant shall cease on ... the date on which a Participant is terminated by [Hanover]." (*Id.* Art. 3). The Plan further provided that "[a] Participant shall be entitled to severance pay and benefits under the Plan only if there occurs a Change of Control and thereafter [Hanover] terminates his/her employment." (*Id.* Art. 4).

Article 10 of the Plan gave the Board the ability to amend or terminate the Plan:

> The Board ... reserves the right at any time to amend or terminate the Plan, except that if the Plan is terminated in anticipation of or upon or after a Change of Control has occurred, the Board ... may not terminate the participation in the Plan of any Participant who is in the Plan when a Change of Control is antici-

pated or as of the date of the Change of Control. . . .

(*Id.* Art. 10).

On April 25, 2001, as reflected in the minutes of meeting, the Board terminated the Plan. (Shull Decl. ¶ 1 & Ex. 1). The minutes show that the Board determined that "no 'Change of Control' . . . is anticipated." (*Id.*, Ex. 1 at 8).

No "Change of Control" has occurred within the meaning of the Plan. (*See* Kaul Dep. at 308–10) (McGrath Decl., Ex. 39).

### e. *Vacation Pay*

In the amended complaint, Kaul asserts a claim for compensation for 13 weeks of accrued and unused vacation, in the amount of $149,325. (Am.Compl.¶¶ 16–18). In his opposition papers to Hanover's motion, he reduces the claim, seeking compensation for only five weeks of accrued and unused vacation. I discuss the additional facts relating to the vacation pay claim below.

### B. *Prior Proceedings*

### 1. *The Filing of Suit*

On June 28, 2001, Kaul commenced this action against Hanover in the Supreme Court of the State of New York, New York County. The complaint alleged a breach of contract based, *inter alia*, on §§ 7(b) and 12 of the Agreement. It contended that Hanover had failed to make "certain termination payments" to Kaul as required by § 7(b) and to pay Kaul's reasonable attorneys' fees as required by § 12. (*See* Compl. ¶¶ 34, 40; *see id.* ¶¶ 5–15). It also asserted claims for accrued and unused vacation pay, for compensation under the Plan, and for bonuses under the LTIP. (*Id.* ¶¶ 43–61).

On July 25, 2001, Hanover removed the case to this Court on the basis of federal question jurisdiction, as Kaul was asserting claims under an employee benefit plan within the meaning of the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*

### 2. *The Exchange of Proposed Releases*

By letter dated July 30, 2001, counsel for Hanover wrote to counsel for Kaul, transmitting a proposed "Confidential General Release and Covenant Not To Sue." (McGrath Decl., Ex. 24). The letter stated:

> By this letter, Hanover reiterates once again and for the final time its unconditional offer to provide Mr. Kaul with severance pay and benefits in full satisfaction of Hanover's obligations to him under the [ ] Agreement in return for his execution of a general release of claims in the form attached to this letter.
>
> . . .
>
> If Mr. Kaul fails to execute and deliver the attached release of claims to Hanover within twenty-one days of receipt of same, this offer shall be withdrawn. This offer is made without prejudice to Hanover's right, which it specifically reserves, to raise any defenses and bring any and all counterclaims it might have against Mr. Kaul should he reject this offer and proceed with his litigation.

(McGrath Decl., Ex. 24). The letter set forth Hanover's offer to pay Kaul nearly $3 million in severance pay and benefits, including $2,186,755.80 in base salary and short-term bonus (after deducting for severance already paid); $554,892 as an additional pro-rated short-term bonus; the cost of health, dental, and life insurance; and $11,486.53 in vacation pay. (*Id.*).

Kaul's counsel responded to the July 30, 2001 letter by letter dated September 6, 2001. The letter referenced this lawsuit and enclosed a document entitled "Confidential General Release," which Kaul had executed (the "Kaul Release"). (McGrath

Decl., Ex. 23). As noted in the letter, the Kaul Release purported to exclude "claims that are not required to be included in the Release under Section 7 of the Employment Agreement." (*Id.*). Specifically, the Kaul Release excluded, *inter alia*, his claims for attorneys' fees and for "damages relating to [Hanover]'s failure to provide benefits" under § 7(b) of the Agreement. (*Id.*). It also excluded claims for benefits and payments purportedly due under the Plan and other specified agreements and plans. (*Id.*).

### 3. The Amended Complaint and Hanover's Answer and Counterclaims

In September 2001, Kaul filed an amended complaint asserting eight causes of action: (1) breach of § 7(b) of the Agreement, (2) breach of § 12 of the Agreement, (3) breach of an agreement (or policy) to make a lump sum payment of accrued, unused vacation upon termination of employment, (4) breach of the Plan in violation of ERISA, (5) breach of Hanover's fiduciary duties under ERISA in connection with his rights under the Plan, (6) for equitable relief with respect to the Plan under ERISA, (7) breach of an obligation to pay Kaul a bonus in connection with the LTIP, and (8) for bonuses under the LTIP on the basis of fraud or mistake if the Agreement were found to have superseded his entitlement to such benefits.

Hanover filed an answer to the amended complaint and counterclaims. Hanover alleged that Kaul had violated his obligations to Hanover under a non-competition and confidentiality agreement as well as under the Agreement. It asserts eight counterclaims for breach of contract, breach of fiduciary duty, unjust enrichment, and unfair competition, as well as a ninth claim entitled "inevitable disclosure."

### 4. The Plan Administrator's Decision

In October 2001, Charles Messina, the Administrator of the Plan (the "Adminis-

trator"), decided to treat the amended complaint as a claim by Kaul under ERISA for benefits under the Plan. (Messina Decl. ¶ 2). On October 17, 2001, the Administrator wrote to Kaul and invited him to submit "all documentation or other evidence" he might have "in support of such possible claim." (*Id.* ¶ 2 & Ex. 2).

Kaul responded through counsel, by letter dated November 19, 2001 to Hanover's counsel. (*Id.* ¶ 3 & Ex. 3). Kaul did not submit any evidence or documents, stating that he was under "no obligation" to respond and making reference to certain documents he contended were already in Hanover's "control." (*Id.*).

On December 13, 2001, the Administrator issued a written decision denying Kaul's "claim" and setting forth the reasons for the denial. (*Id.* ¶ 4 & Ex. 4).

By letter from his counsel dated March 18, 2002, Kaul requested reconsideration of the Administrator's decision. (Lambert Decl. ¶ 2 & Ex. 2). The Board designated a three-person Appeals Committee to consider Kaul's request for reconsideration. (*Id.* ¶ 1). After convening three times to consider Kaul's appeal, the Appeals Committee issued a written decision rejecting Kaul's claim. (*Id.* ¶¶ 3–7 & Ex. 6).

### 5. The Instant Motions

After Kaul filed his amended complaint in this case and Hanover filed an answer and counterclaims, the parties engaged in a long and contentious course of discovery.

On April 11, 2002, Hanover wrote a letter to the Court requesting a pre-motion conference to discuss the filing of a motion for leave to file an amended answer and counterclaims. Hanover sought to amend its pleading to add assertions that Kaul had engaged in misconduct—including the misappropriation of corporate resources and opportunities—during his tenure as

president. By memorandum endorsement dated April 23, 2002, the Court treated the letter as a motion for leave to amend and denied the request.

These motions followed.

Hanover's motion for summary judgment seeks dismissal of each of Kaul's claims. The motion also seeks summary judgment in its favor on its claim that Kaul would be unjustly enriched if he is permitted to retain $211,729 that Hanover loaned to him.

Kaul's motion for partial summary judgment seeks dismissal of five of Hanover's affirmative defenses and all nine of Hanover's counterclaims.

Hanover's motion for leave to amend seeks to (i) add an "after-acquired evidence" defense to Kaul's claims, (ii) amend its counterclaims to clarify that its breach of fiduciary duty claims include a claim that Kaul was improperly reimbursed for certain professional fees, and (iii) to add a counterclaim based on Kaul's failure to reimburse Hanover the $211,729.

### DISCUSSION

I discuss (A) Kaul's claims; (B) Hanover's affirmative defenses and counterclaims; and (C) Hanover's motion for leave to amend.

### A. Kaul's Claims

I discuss Kaul's five claims (or sets of claims).

#### 1. Plaintiff's Claims Under § 7(b)

Kaul's claims for severance benefits under § 7(b) of the Agreement are barred by his failure to meet at least one of the two conditions precedent set forth in § 7(g). The Agreement provided that "to be eligible for the payments and benefits as set forth in Section 7(b)," Kaul "must execute and deliver to [Hanover] a general release in favor of [Hanover], excepting statutory contribution and indemnity rights to which

[Kaul] is entitled." (Agreement § 7(g)). Hence, unless Kaul executed and delivered to Hanover a general release, he was not entitled to payments and benefits under § 7(b).

Kaul does not deny that the execution and delivery of a general release was a condition precedent to his entitlement to severance benefits under § 7(b). *See Duff v. Trenton Beverage Co.*, 4 N.J. 595, 73 A.2d 578, 583 (1950) ("Generally, no liability can arise on a promise subject to a condition precedent until the condition is met."); *Levison v. Weintraub*, 215 N.J.Super. 273, 521 A.2d 909, 910 (1987) ("where the terms of a contract are clear and unambiguous there is no room for interpretation or construction and [the court] must enforce those terms as written"); *Castle v. Cohen*, 840 F.2d 173, 177 (3d Cir.1988) ("a condition is defined as an act or event which 'must occur before a duty of performance under an existing contract becomes absolute'"). Rather, he makes two alternative arguments: (a) he complied with the condition precedent because he tendered an "appropriate release," or (b) compliance was not required because Hanover breached the Agreement. (*See* Pl. SJ Mem. at 2–7; Pl. Opp. Mem. at 1–6). Both arguments are rejected.

#### a. The Kaul Release

As the parties agree, the first argument raises only issues of law. No factual disputes are presented. Hence, the matter is ripe for summary judgment.

It is undisputed that Kaul did not tender a release until September 6, 2001, when his counsel delivered the Kaul Release. Of course, this was *after* Kaul had filed suit. Even putting aside the issue of the timeliness of this proffer, the condition precedent was not met as a matter of law because the Kaul Release was not a "gen-

eral release" as required by § 7(g) of the Agreement.

■ A "general release" is a release that "covers all claims and demands due at the time of its execution." *Bilotti v. Accurate Forming Corp.*, 39 N.J. 184, 188 A.2d 24, 35 (1963); *accord State v. DeAngelis*, 329 N.J.Super. 178, 747 A.2d 289, 293 (2000) ("A general release ordinarily covers all claims and demands at the time of the execution unless, by its terms, the parties restrict it to particular claims and demands."). Here, § 7(g) required a "general release" with only *one* exception: "statutory contribution and indemnity rights to which [Kaul] is entitled." Of course, the fact that § 7(g) specifically excluded one category of rights demonstrates that no other exclusions were contemplated. *See, e.g., M.G.M. Constr. Corp. v. N.J. Educ. Facilities Auth.*, 220 N.J.Super. 483, 532 A.2d 764, 768 (1987) (applying maxim *inclusio unius est exclusio alterius* ).

The Kaul Release was far from a "general release," as it carved out many exceptions in addition to the permitted exception of "statutory contribution and indemnity rights." Indeed, by its terms, the Kaul Release did not release Kaul's claims for (i) attorneys' fees under § 12 of the Agreement; (ii) damages for Hanover's "failure" to provide § 7(b) benefits; (iii) amounts due under the Plan; and (iv) compensation

and/or benefits purportedly due under other specified agreements and plans. (McGrath Decl., Ex. 23). Hence, Kaul wanted the right to pursue these claims *and* more than $2.7 million in severance and benefits. (*See id.*). Instead of releasing "all claims and demands," Kaul was seeking to preserve the right to pursue virtually all conceivable claims and demands.

Kaul argues that the Kaul Release complies with § 7(g) because it merely carves out his claims for compensation "in accordance with the main part" of § 7. (Pl. SJ Mem. at 3). As an initial matter, even assuming that Kaul was entitled to carve out claims arising under the "main part" of § 7, the Kaul Release purported to carve out more.[2] More importantly, the language of § 7(g) belies Kaul's argument, as it does not permit an exclusion for rights under the "main part" of § 7. The omission is understandable, for obviously it was intended to avoid a situation where Hanover would pay Kaul $3 million in severance benefits only to find itself later embroiled in litigation with Kaul over other purported claims. The requirement of a general release was included to avoid this result.

To the extent Kaul had other meritorious claims—a claim for one additional week of vacation pay, for example—these items were either covered by the one per-

---

2. The language of the Kaul Release is broader than the language used in the main part of § 7 of the Agreement. The main part of § 7 provided that after the termination of his employment, Kaul was entitled to:

compensation and benefits on and after the date of such termination *only as provided* in this Section 7, the 2000 Short–Term Plan and the 2000 Long–Term Plan and under the terms of any prior agreement *still in effect on the date of termination as set forth in Section 10,* or pursuant to the terms of any benefit plan maintained by [Hanover] and in which [Kaul] is a participant or a beneficiary at the time of his termination.

(Agreement § 7) (emphasis added). The Kaul Release sought to carve out all of these claims and more, including claims "concerning, arising from or in any way [ ] related to":

compensation and/or benefits on and after the Termination Date as provided ... under the terms of *any agreement in effect on or after the Termination Date* and/or pursuant to the terms of any benefit plan maintained by [Hanover] in which Kaul was a participant or a beneficiary at the time of his termination.

(McGrath Decl., Ex. 23) (emphasis added).

mitted exclusion or surely they could have been negotiated. If not, that was the bargain Kaul had struck—to obtain the approximately $3 million in benefits under § 7(b), he had to give up his other claims (other than statutory contribution and indemnity rights). It was his choice.

Of course, by executing and delivering a general release, Kaul was not giving up his claims for benefits under § 7(b). Those benefits were part of the bargain, the consideration for the general release, and Hanover's contractual obligation to pay § 7(b) benefits obviously would have survived the delivery of a general release.

### b. *Hanover's Purported Breach*

■ Kaul also argues that compliance with the condition precedent of a general release is excused because Hanover breached the Agreement. This argument is also rejected. First, it is undisputed that Hanover did provide Kaul with some severance payments ($341,803) and benefits coverage for a number of months. Second, Kaul's assertions of a breach by Hanover are purely conclusory. (*See* Pl. SJ Mem. at 6–7; Pl. Opp. Mem. at 6). As discussed above, Hanover's obligation to pay Kaul benefits under § 7(b) was not triggered until Kaul executed and delivered a general release. Third, even assuming Hanover did breach the Agreement, Kaul has not demonstrated why he is entitled to enforce his contractual rights under § 7(b) without complying with a clear contractual condition precedent.

As a consequence of his failure to execute and deliver a "general release" as required by § 7(g), Kaul's claims for payments and benefits under § 7(b) are barred as a matter of law. These claims are dismissed.

### 2. *Kaul's Claims Under § 12*

■ Hanover's motion for summary judgment dismissing Kaul's claims for attorneys' fees pursuant to § 12 of the Agreement is granted in part and denied in part.

Pursuant to § 12, Hanover was required to pay Kaul's "reasonable legal fees in full in the event that he must seek legal counsel to enforce any of his rights under this Agreement." I agree with Kaul that Hanover's obligation to pay his fees was not contingent on the existence of litigation or on his prevailing in litigation.

On the other hand, § 12 only requires the payment of "reasonable" legal fees. Fees incurred in the pursuit of meritless claims are not reasonable, nor are fees that are disproportionately high in relation to the value of arguably meritorious claims.

I hold, as a matter of law, that § 12 does not obligate Hanover to reimburse Kaul for his legal fees incurred in prosecuting this lawsuit. As discussed in this opinion, his claims are largely meritless, and the value of the one or two arguably meritorious claims certainly does not justify, for example, the taking of 25 depositions, as Kaul took in this case, according to Hanover's counsel. (Def. SJ Mem. at 1).

I hold further that Kaul was entitled to be reimbursed for reasonable legal fees incurred in seeking advice and representation in connection with the termination of his employment. This would include legal services to review the various agreements, to investigate the facts and circumstances, to advise Kaul on his rights under the Agreement, to review or draft a proposed general release, and to negotiate Kaul's final severance payments and other benefits. In fact, Hanover acknowledged this obligation and paid Kaul's attorneys some $37,000 in this respect.

Genuine issues of fact exist, however, as to the amount of a reasonable fee in light of all the circumstances. Accordingly,

summary judgment is denied to this extent.

### 3. *Kaul's Claims for a Tandem Bonus*

■ The parties agree on many of the facts relating to the LTIP and the payment of Tandem Bonuses. They agree that in the end Kaul surrendered his shares, the "payroll entry" was reversed, Kaul did not receive a Tandem Bonus, and the amended Note was deemed satisfied. Although there are some factual disagreements—including whether the $211,729 debt was carved out—the issues turn on the unambiguous language of the LTIP.

Kaul claims that he is entitled to a Tandem Bonus even though he surrendered the shares and the Note was satisfied. He contends that under the LTIP he was entitled to a Tandem Bonus irrespective of any obligation to pay for the purchase of shares. The claim is rejected, for it is belied by both the plain language of the LTIP and its stated purpose.

The LTIP provided that Hanover "shall pay [Kaul], on or before each due date . . . of any payment of principal and/or interest on the Note, *a bonus equal to the amount of such principal and/or interest then due.*" (LTIP § 5(a)) (emphasis added). Once Kaul surrendered his shares, the amended Note was deemed satisfied and no principal or interest was "then due." Hence, Hanover had no further obligation to pay Kaul a Tandem Bonus. Moreover, Kaul has pointed to no language in the LTIP that supports his assertion that he was entitled to a cash bonus even though he surrendered his shares.

Moreover, the purpose of the LTIP was to "align" Kaul's interests with Hanover's interests by giving him a substantial equity stake in the company. The concept was to give him *stock* as an incentive; he was to purchase the stock at market value and Hanover would give him bonuses to be used to pay for the stock. The LTIP did not contemplate giving him any cash bonuses independent of the ownership of stock. Once Kaul decided to surrender the stock, there no longer was an "alignment" of interests in this respect, and Kaul had no contractual entitlement to a bonus that was always intended to be used only to pay for the purchase of stock.

Kaul argues that the LTIP does not contain a "condition precedent" that the Tandem Bonus is payable only if he is obligated to make a payment under the Note, the Note is a non-recourse secured only by the shares, and that Hanover is in essence seeking a "double recovery." (Pl. Opp. Mem. at 13–14 & n. 6). These arguments are not persuasive.

First, the issue is not one of a condition precedent. Rather, the essence of the agreement was the connection between stock ownership and the payment of the bonus. The bonus was intended to finance the purchase of the stock; when the stock was surrendered and the Note was satisfied, no amount was "then due," and thus Kaul was no longer entitled to a bonus.

Second, the fact that the Note was a non-recourse promissory note is irrelevant for these purposes. Hanover was not looking to Kaul's other assets for payment of the Note. The Note specifically contemplated that it would be repaid through the application of bonuses that were specifically earmarked for this purpose. The non-recourse nature of the Note has no bearing on whether any amounts were "then due" on the Note.

Finally, Hanover has not obtained a double recovery or any kind of windfall by any means. It was under no obligation to offer Kaul the option of surrendering the shares, but it did so as an accommodation to Kaul. Moreover, Kaul was not required to surrender the shares; he had the option

to retain the shares, but he chose not to do so.

### 4. *Kaul's Claims Under the Plan*

 Kaul asserts several ERISA claims based on his assertions that his participation in the Plan and the Plan itself were improperly terminated. (Am. Compl., Counts IV, V, VI). Hanover moves for summary judgment on the basis that, *inter alia,* Kaul's participation in the Plan was properly terminated when his employment was terminated and that the Board properly terminated the Plan as well. I agree.

Although the parties disagree as to the applicable standard of review, I assume, for purposes of this motion, that the standard of review is de novo.

By its terms, the Plan was intended "to attract and retain key management personnel by reducing uncertainty and providing greater personal security in the event of a Change of Control." Kaul was the only participant in the Plan, and the Plan obviously was intended to provide him with certain security—additional severance pay and benefits—in the event of a change of control of Hanover. Hence, Kaul was:

> entitled to severance pay and benefits under the Plan only if there occurs a Change of Control and thereafter [Hanover] terminates his[ ] employment Without Cause or [he] voluntarily terminates his[ ] employment for Good Reason during the two (2) year period following the Change of Control.

(Plan, Art. 4).

The term "Change of Control" is defined in the Plan, and as Kaul conceded at his deposition in this case, there has been no "Change of Control" as contemplated by the Plan:

> Q. Do you contend that a change in control occurred at any time prior to, a change in control within the meaning of this agreement [the Plan], at any time prior to December 5, 2000?

> A. That's not my contention in the complaint.

> . . .

> Q. Is it your contention that a change in control within the meaning of this agreement has ever occurred?

> A. No, that is not my contention.

> . . .

> Q. . . . Do you know of any facts to suggest that such a thing has ever occurred?

> A. No, it has not occurred.

(Kaul Dep. at 308–09) (McGrath Ex. 39).

Under the plain language of the Plan, then, Kaul is not entitled to any severance pay or benefits under the Plan because there has been no "Change of Control."

Moreover, the Plan also provided that "prior to a Change of Control the participation in the Plan of any Participant shall cease on . . . the date on which a Participant is terminated by [Hanover]." (Plan, Art. 3). Here, as Kaul's employment was terminated by Hanover on December 5, 2000, and there had been no "Change of Control," his participation in the Plan "cease[d]" by its terms.

Finally, Article 10 of the Plan expressly reserved to the Board the "right at any time to amend or terminate the Plan." The only limitation was that if the Plan was terminated "in anticipation of or upon or after a Change of Control," the rights of "any Participant who is in the Plan" could not be affected. The Board terminated the Plan on April 25, 2001, nearly five months after Kaul—the sole "Participant"—had been dismissed. There had been no "Change of Control" by then.

Kaul argues that he has presented evidence that shows that the Board terminated the Plan "in anticipation of . . . a Change of Control." The evidence he relies on, however, is nothing more than evidence that Hanover explored options

and alternatives and considered expressions of possible interest from other entities. (*See, e.g.,* Bulle II Dep. at 43–45; Lawrence Dep. at 101–10; Bayoneto Decl., Ex. 30 ("we have begun to move forward with a revised Business Plan, and we are also continuing to explore potential strategic options for the company"); *id.,* Ex. 31 (discussing potential sale of Hanover's assets); *id.,* Ex. 32 (memorandum discussing potential sale of one of Hanover's units)). No evidence has been cited of anything beyond mere exploration; no evidence has been presented of an actual decision to effectuate a Change of Control. A reasonable factfinder could not conclude from the evidence in the record that the Board terminated the Plan "in anticipation of . . . a Change of Control." Rather, a reasonable factfinder could only conclude that the Board terminated the Plan because the only participant in the Plan had been discharged.

Accordingly, Kaul has no viable claim for benefits under the Plan, and the Administrator and Appeals Committee correctly denied his claims for benefits under the Plan. Kaul's ERISA claims are dismissed.

### 5. *Vacation Pay*

 Kaul's final claim is for vacation pay. In his amended complaint, he sought 13 weeks vacation pay; in his opposition papers, he has reduced the claim to five weeks vacation pay: one week for 1999, because he was unable to take one week because of the press of Hanover business; and four weeks for 2000, as his employment was terminated in December 2000 and he had not yet taken any vacation that year. (Pl. Opp. Mem. at 16–17).

As to the one week for 1999, summary judgment is granted in favor of Kaul. Although there is some issue as to whether he obtained written permission of the compensation committee to carry over the one week, Charles Messina and Thomas C. Shull, two high-ranking officers of Hanover, both testified at deposition that Hanover agreed that Kaul could carry over one week from 1999 because he could not take a full planned vacation because of work commitments. (Messina IV Dep. at 14–16; Shull Dep. at 362). On this record, a reasonable factfinder could only find that Hanover had agreed that Kaul could carry over the one week of unused vacation in 1999.

As to the four weeks in 2000, summary judgment is granted in favor of Kaul for three out of the four weeks. Again, Messina testified that Hanover's policy was to pay employees who were "separated" their accrued and unused vacation for the year in which they were separated. (Messina III Dep. at 209, 212). Messina testified that Kaul was entitled to three weeks vacation in 2000. (*Id.* at 182, 190). Kaul testified that he was entitled to four weeks vacation in 2000. (Kaul Dep. at 125) (McGrath Decl., Ex. 38). Hence, there is no dispute that Kaul was entitled to vacation pay for at least three weeks for 2000. An issue of fact exists as to his entitlement to the fourth week.

As to vacation pay, then, summary judgment is granted in favor of Kaul for one week of vacation pay for 1999 and three weeks of vacation pay for 2000; summary judgment is granted in favor of Hanover dismissing Kaul's claims for vacation pay in excess of five weeks; and summary judgment is denied as to one week of vacation pay, *i.e.,* the disputed fourth week for 2000.

### B. *Hanover's Affirmative Defenses and Counterclaims*

Hanover has asserted a number of affirmative defenses and counterclaims. Kaul moves for partial summary judgment striking certain of these affirmative de-

fenses and dismissing certain of these counterclaims.

As for the affirmative defenses, Kaul's motion is granted, for in light of my rulings above, the affirmative defenses are largely moot. Only two claims remain: the claim for attorneys' fees and the claim for one week's vacation. To the extent any affirmative defenses are implicated with respect to these claims, we will address them at trial.

With respect to Hanover's counterclaims, Kaul has moved for summary judgment with respect to the following counterclaims: (i) Counts IV (breach of the Agreement) and VII (unjust enrichment) to the extent they allege that Kaul did not tender an appropriate release; (ii) Counts III (breach of the Agreement), V (breach of fiduciary duty), and VIII (unfair competition) to the extent they allege breach of a non-compete provision in the Agreement; (iii) Counts I and II (breach of non-competition and confidentiality agreement), V (breach of fiduciary duty), and VIII (unfair competition) to the extent they allege breach of a confidentiality agreement; (iv) Count IX (inevitable disclosure); and (v) Count V (breach of fiduciary duty) and Count VI (unjust enrichment). As for these counterclaims, Kaul's motion is granted in part and denied in part.

Finally, in its motion for summary judgment, Hanover requested summary judgment in its favor on its claim that Kaul owes it $211,729 on account of the monies Hanover advanced to the IRS on Kaul's behalf. I address this claim first. I then discuss the counterclaims that are the subject of Kaul's motion for partial summary judgment.

### 1. *Hanover's Claim for $211,729*

■ Hanover seeks to recover the $211,729 it had paid to the IRS on Kaul's behalf. Although its counterclaims do not specifically address the $211,729 loan,

Hanover argues that the claim is covered by Count VI, which alleges that Kaul was "unjustly enriched" at Hanover's expense by accepting "salary, bonus and other compensation and employee benefits" while "act[ing] in a manner which was contrary to the best interests of [Hanover]."

This branch of Hanover's motion for summary judgment is denied, for Hanover has not demonstrated that it is entitled to judgment as a matter of law in this respect. First, even assuming the $211,729 loan is properly covered in Count VI, Hanover has not demonstrated as a matter of law that Kaul engaged in conduct "contrary to the best interests" of Hanover." Second, although there appears to be no dispute that Hanover paid $211,729 to the IRS on Kaul's behalf, the loan was incorporated into the non-recourse Note and the Note was deemed satisfied. By the Note's terms, Hanover could only look to the Hanover shares in question for recourse.

Hanover states in conclusory fashion that the $211,729 was carved out of the arrangement, but it has not submitted any definitive documentation in this respect. (*See* Hanover SJ Mem. at 48–49). The only document submitted by Hanover is the hand-written note that Kaul faxed to Bulle. (Kingsford Decl., Ex. 1). Kaul wrote: "the [N]ote included a sum of $211,729 for which there is no forgiveness." (*Id.*). Although that entry supports Hanover's position that the $211,729 was excluded, in the context of the entire document the statement is less than clear. If indeed the parties had intended that Kaul continued to owe the $211,729 after the Note was satisfied and that Hanover could look to assets other than the shares to obtain repayment, one would expect that Hanover would have confirmed that understanding in writing. No such writing has been presented to the Court (as far as

I can tell from the many volumes of exhibits that have been submitted). It is not clear on the record before the Court whether Hanover can look to any of Kaul's assets to recover for his failure to repay the $211,729 other than the shares of Hanover common stock—which already have been surrendered.

### 2. Hanover's Release Claims

Kaul's motion for summary judgment dismissing Counts IV (breach of the Agreement) and VII (unjust enrichment) of Hanover's counterclaims to the extent they allege that Kaul did not tender an appropriate release is denied and summary judgment is granted in favor of Hanover, for the reasons set forth above. As noted, I conclude as a matter of law that Kaul did not tender an appropriate release.

### 3. The Non–Compete Provision

■ Kaul's motion for summary judgment dismissing Counts III (breach of the Agreement), V (breach of fiduciary duty), and VIII (unfair competition) of Hanover's counterclaims to the extent they allege breach of a non-compete provision in the Agreement is granted. Although issues of fact exist as to whether Kaul breached his obligations under the non-compete provision, Hanover has presented no evidence of damages. Kaul moved for summary judgment in part on this basis, and Hanover has not disputed Kaul's assertion that it has suffered no damages. (Hanover Opp. Mem. at 17–33 & nn. 16, 20). Instead, Hanover responds only by asserting that (i) damages are not necessary to sustain its defenses, (ii) once a breach is established at least nominal damages are in order, and (iii) it is seeking injunctive relief.

As noted above, the viability of the defenses is moot. Damages are a necessary element of a breach of contract action. *Cumberland Co. Improvement Auth. v.*

*GSP Recycling Co., Inc.,* 358 N.J.Super. 484, 818 A.2d 431, 442 (2003) (party asserting breach of contract claim has "burden of proof to establish all elements of its cause of action, including damages"); *see also Harsco Corp. v. Segui,* 91 F.3d 337, 348 (2d Cir.1996) (applying New York law and holding that damages was an element of cause of action for breach of contract). Under the circumstances of this case—where Kaul was fired and Hanover has asserted these claims only in response to Kaul's suit—I would not issue injunctive relief, even assuming Hanover could prove all of its allegations in this respect.

### 4. Confidentiality Provision Claims

Kaul's motion for summary judgment dismissing Counts I and II (breach of non-competition and confidentiality agreement), V (breach of fiduciary duty), and VIII (unfair competition) of Hanover's counterclaims to the extent they allege breach of a confidentiality agreement is granted. My analysis with respect to the non-compete claims applies here as well. Even assuming a breach as alleged, the validity of the affirmative defenses is largely moot, no reasonable factfinder could find damages, and I would exercise my discretion not to grant injunctive relief.

### 5. The Inevitable Disclosure Claim

Kaul's motion for summary judgment dismissing Count IX of Hanover's counterclaims, the inevitable disclosure claim, is granted, for the reasons I have granted summary judgment dismissing the claims based on the non-compete provision and confidentiality agreement.

### 6. Counts V and VI

Kaul moves for summary judgment dismissing Counts V (breach of fiduciary duty) and Count VI (unjust enrichment) of Hanover's counterclaims. These coun-

terclaims are based on three sets of allegations: (a) Kaul hired unqualified executives to work at Hanover; (b) Kaul improperly drew a car allowance; and (c) real property leased to Hanover in Edgewater, New Jersey was improperly re-let to "Edgewater Pediatrics," Kaul's wife's medical practice. Kaul's motion is granted and these counterclaims are dismissed.

Hanover has withdrawn its claim that Kaul breached his fiduciary duties by hiring unqualified executives. (Hanover Opp. Mem. at 33–34 n. 36). Hence, this prong of the motion is granted.

■ The counterclaims based on the payment of car allowances are dismissed. Hanover paid Kaul a car allowance for almost five years. These payments were made openly and with full knowledge of Hanover's management: Hanover's Chief Financial Officer approved the payments in writing (Bayoneto Decl., Ex. M (memo dated 4/26/96 directing payment of monthly car allowance)); Hanover's management, Board members, general counsel, outside counsel, and outside auditors were all aware of the payments, which were described every year in Hanover's annual proxy statements (see 1996 Proxy at HDI 03811; 1997 Proxy at 10 n. 2; 1998 Proxy at HDI 04869–70 n. 4; 1999 Proxy at 7–8 n. 8; 2000 Proxy at 4–5 n. 8; 2001 Proxy at 4–5 n. 9); and the Chairman of Hanover's Compensation Committee twice discussed Kaul's car allowances with Hanover's general counsel. (Hewitt Dep. at 216–25). Hence, Hanover knowingly made these payments to Kaul every month for almost five years.

Hanover now argues that Kaul must repay the car allowances because he was not entitled to them and they were never authorized by the Board or the Compensation Committee, and it argues that Kaul breached his fiduciary duties to Hanover by accepting the car allowances in these circumstances. These arguments are rejected. Kaul asked for a car allowance from Hanover because he had received a car allowance at his prior place of employment; Hanover agreed to give it to him and paid it for almost five years; the payments were not hidden from anyone and, to the contrary, Hanover's senior management and inside and outside advisors knew of and approved the payments. Under these undisputed circumstances, it was not a breach of Kaul's fiduciary duties for him to accept the payments, and he would not be unjustly enriched if he were permitted him to retain them now.

■ Finally, the counterclaims are also dismissed to the extent they are based on the leasing of the property to Kaul's wife. Again, senior management of Hanover was aware of and approved this transaction. The minutes of a meeting of Hanover's Transactions Committee on November 4, 1999, show the following:

The Chairman then called for discussion regarding a possible return to the landlord of certain space *not currently being used by the Company* with the knowledge that the space may then be relet by Mr. Kaul's wife as office space. After discussion, the Committee concluded that there was no conflict whatsoever between the Company, *which no longer needed the space,* and Mr. Kaul, whose wife would be dealing directly with the landlord after the space was returned....

(Bayoneto Decl., Ex. P) (emphasis added).

Senior management of Hanover, with the assistance of outside counsel, negotiated the return of the property to the landlord. (Messina I Dep. at 95–96; Bulle Dep. at 82, 84, 87). In fact, from 1998 to April 2000, much of the 20,000 square foot space was not being used. Hanover had been trying to sublease some of the unoccupied space for a lengthy period of time,

without success. Hanover was using some of the space as warehouse space, for which it was paying $18 a square foot, when generally warehouse space was renting at the time for $6 a square foot. (Tannenhols Dep. at 50–57, 62–63, 65–66, 82–83). After Hanover was released from the lease and relieved of its obligation to pay for unused space, Kaul's wife rented approximately 1,900 square feet of the space at $18 per square foot. (Bayoneto Decl., Ex. T at Addendum ¶ 1 at RK 000048). By the end of 2000, Hanover had abandoned the Edgewater facility entirely, and had set up a "restructuring reserve of $1.4 million for lease exit cost as well as [a] write-off [of] $400,000 worth of expenses." (Adiletta Dep. at 113–14; see Bayoneto Decl., Ex. U ¶ 5 at 2).

Hanover simply has not presented any evidence from which a jury could conclude that Kaul had committed fraud on the Board in this respect. The space had been largely unused for some time, and thus Hanover had been paying rent needlessly. The circumstances were disclosed to the Transactions Committee, and Hanover undoubtedly was in a better position than Kaul's wife to know the conditions of the real estate market in Edgewater. Although Hanover apparently later determined to re-rent the space, no reasonable jury could find that somehow Kaul had defrauded and deceived Hanover into giving up a valuable corporate opportunity to his wife.

Hanover's argument that Kaul improperly spent his own time and improperly diverted the time of other Hanover employees for the benefit of his wife is specious. On the record before the Court, a reasonable jury could only conclude that Hanover is grasping at straws in an effort to strike back at Kaul for initiating this lawsuit.

## C. *Hanover's Motion for Leave to Amend*

 Hanover's motion for leave to amend its affirmative defenses and counterclaims is denied in part and granted in part. The motion is granted to the extent Hanover is permitted to add a claim based on Kaul's purported failure to repay the $211,729 that Hanover paid to the IRS on Kaul's behalf. The motion is otherwise denied.

The parties have had discovery with respect to the claim for $211,729, and that claim is fairly part of the case. Moreover, it is arguably covered by Hanover's counterclaim for unjust enrichment. Kaul would suffer no prejudice by an amendment formally adding the claim.

As for Hanover's proposed counterclaims that Kaul breached his fiduciary duties by accepting improper car payments and diverting the Edgewater leased property to his wife, I have already addressed these claims above. The motion for leave to amend is denied as to these claims for the reasons stated above.

I have not yet addressed Hanover's proposed claims for: (i) $42,584 in purportedly unauthorized reimbursement for fees charged by an employment consultant (invoices totalling $52,584 less the approved amount of $10,000); (ii) $38,676 in similar fees reimbursed to Kaul in late 2000; and (iii) $36,000 for an unauthorized excess long term disability policy, paid for by Hanover. The motion for leave to amend is also denied as to these three proposed additional claims. They are more of the same. The payments were authorized by senior Hanover management and made long ago. No reasonable jury could find that Kaul defrauded Hanover or breached its fiduciary duties when it submitted these claims for reimbursement. Instead, it is clear that Hanover is now simply seeking to change its mind; although it paid these

benefits to Kaul long ago, it is seeking to reverse the payments because Kaul dared to bring suit. Even assuming Kaul's claims are meritless—and most are—Hanover will not be permitted now to seek to strip Kaul of compensation he was paid over the years of his employment merely because he has sued.

## CONCLUSION

For the reasons set forth above, the motions are denied in part and granted in part. Only three claims remain in the case: (i) Kaul's claim for attorneys' fees pursuant to § 12 of the Agreement; (ii) Kaul's claim for an additional week of vacation pay; and (iii) Hanover's counterclaim for the $211,729 plus interest. As the claim for attorneys' fees does not involve the issue of entitlement but only the issue of the amount of reasonable fees, that claim will be tried to the Court without a jury. *See McGuire v. Russell Miller, Inc.,* 1 F.3d 1306, 1313 (2d Cir.1993) ("[W]hen a contract provides for an award of attorneys' fees, the jury is to decide at trial whether a party may recover such fees; if the jury decides that a party may recover attorneys' fees, then the judge is to determine a reasonable amount of fees."). The remaining two claims will be tried to a jury.

Counsel for the parties shall appear for a pretrial conference on January 23, 2004, at 11:30 a.m., in Courtroom 11A of the United States Courthouse at 500 Pearl Street.

SO ORDERED.