Edith **SCHNEIDER** and Herman
Schneider, Plaintiffs-Appellees,

v.

Emanuel **REVICI**, M.D., and Institute
of Applied Biology, Inc.,
Defendants-Appellants.

No. 585, Docket 86–7145.

United States Court of Appeals,
Second Circuit.

Argued Dec. 1, 1986.

Decided April 30, 1987.

Samuel A. Abady, New York City (Abady & Jaffe, Matthew G. Dineen, Richard A. Jaffe, New York City, of counsel), for defendants-appellants.

Alice Collopy, Great Neck, N.Y. (Pegalis & Wachsman, Great Neck, N.Y., of counsel), for plaintiffs-appellees.

Before NEWMAN and MINER, Circuit Judges.*

MINER, Circuit Judge:

Emanuel Revici, M.D. and the Institute of Applied Biology, Inc. (the "Institute") appeal from a judgment entered in the United States District Court for the Southern District of New York (Motley, J.), in a diversity action arising from Dr. Revici's treatment of plaintiff Edith Schneider's breast cancer with unconventional, non-invasive cancer therapy, after she had been advised by numerous doctors to undergo a biopsy and had refused to do so. Edith Schneider and her husband asserted four claims against Dr. Revici and the Institute: (1) fraud, premised on Dr. Revici's alleged promise to cure Mrs. Schneider of breast cancer; (2) medical malpractice; (3) a claim for lack of informed consent under N.Y.

---

* Judge Mansfield, originally a member of the panel, died on January 7, 1987. The appeal is being decided by the remaining members of the panel pursuant to Local Rule § 0.14(b).

Pub.Health Law § 2805–d; and, (4) a derivative claim asserted by Mr. Schneider for loss of consortium. After the district judge refused to charge the jury on the affirmative defense of express assumption of risk, the jury returned a verdict for the plaintiffs on the medical malpractice claim, and a loss of consortium claim. It awarded Edith Schneider and her husband $1,000,000.00 and $50,000.00 respectively. Because the jury found that Mrs. Schneider was equally responsible, through her own culpable conduct, for the damages she suffered, the awards were halved to $500,000.00 and $25,000.00, pursuant to New York's comparative negligence statute, N.Y.Civ.Prac.L. & R. 1411.

On appeal, Dr. Revici and the Institute challenge the district court's refusal to charge with respect to an alleged covenant not to sue and express assumption of risk as affirmative defenses, either of which would serve as a total bar to recovery. Appellants also contend that numerous evidentiary rulings were erroneous. Because we hold that express assumption of risk was available as a total defense to this action under New York law, we reverse and remand this case for determination of that issue only.

## I. BACKGROUND

In October 1981, Dr. Cocoziello discovered a lump in appellee Edith Schneider's right breast during her annual gynecological checkup. Dr. Cocoziello referred Mrs. Schneider to Drs. Snyder and Lichy, who performed a bilateral mammogram and compared the results to one taken in 1978. Dr. Lichy's report indicated the presence of a "one centimeter nodulation" in the right breast, and advised a biopsy, both in the report to Dr. Cocoziello and by telephone to Mrs. Schneider. Joint App. at 1229. Mrs. Schneider told Dr. Lichy that she did not want a biopsy and would seek a doctor who would treat her nonsurgically. *Id.* Dr. Cocoziello also urged Mrs. Schneider to have a biopsy and referred her to three general surgeons: Dr. Abessi, Dr. Addeo, and Dr. Volke. Mrs. Schneider was examined by Dr. Abessi and Dr. Volke, who both separately advised her to undergo a biopsy and possibly a partial mastectomy, depending upon the analysis of the biopsied tissue. She refused. *Id.* at 1241.

In November 1981, Mrs. Schneider consulted with Dr. Emanuel Revici, defendant-appellant herein, who is the President and Scientific Director of the Institute. Dr. Revici is a physician and researcher who treats cancer patients with "non-toxic," non-invasive methods that have not been adopted by the medical community. Mrs. Schneider had learned of Dr. Revici and his novel cancer therapy from a radio program. After Mrs. Schneider signed a detailed consent form,[1] Dr. Revici diagnosed cancer of

---

1. Mrs. Schneider signed a consent form that reads as follows:

*CONSENT FOR MEDICAL CARE*
This is to certify that I the undersigned: I am presenting myself for diagnosis and treatment to be rendered by Dr. Emanuel Revici, 164 East 91st, New York, N.Y.
I fully understand that some of the treatment procedures and medications are still investigatory awaiting further research and submission for F.D.A. approval. I was made aware of the fact that the preparations used were thoroughly investigated for being non-toxic and effective in treatments of human patients. I voluntarily consent to the rendering of such care, diagnostic procedures, medical treatments, rehabilitative procedures.
I am aware that the practice of medicine is not an exact science and I acknowledge that no guaranties have been made to me as to the results of the treatment procedures and medications.

I acknowledge that this form has been explained to me and I certify that I understand its contents.
I therefore release Dr. Emanuel Revici from all liabilities to me, including all claims and complaints by me or by other members of my family. I am here because I wish to try the Revici methods and preparations for disease control.
I also agree to have my medical records used for research purposes and for publication in books, scientific journals, newspapers and magazines.
Joint App. at 1101.
Dr. Revici testified that Mrs. Schneider had told him that she had not seen other doctors and had not yet had a mammogram. He testified that because of this, he explained the consent form to her in great detail:
I showed the consent and we showed clearly when we discussed every point because I had [the] impression that Mrs. Schneider was not telling me the truth when she told me that she

the right breast and began treatment with selenium and dietary restrictions. While Mrs. Schneider claims that Dr. Revici never advised either a biopsy or surgery, Joint App. at 485, his records show that in February 1982, and on three later occasions, he recommended that she have the tumor surgically removed. Joint App. at 1104–05. After fourteen months of treatment, the tumor had increased in size, and cancer had spread to her lymph system and left breast. Mrs. Schneider finally underwent a bilateral mastectomy at Memorial Sloan-Kettering Hospital in January 1983, followed by sixteen months of conventional chemotherapy.

Mrs. Schneider brought this diversity action against Dr. Revici and the Institute for damages, alleging common law fraud, common law medical malpractice and lack of informed consent pursuant to N.Y.Pub. Health Law § 2805–d. Mr. Schneider also sued for loss of consortium. On the eve of trial, defendants sought leave either to clarify their Third Affirmative Defense of "culpable conduct" or to amend their answer to include express assumption of risk as an affirmative defense. In a pre-trial order, dated November 11, 1985, the trial judge denied the motion, apparently on the grounds that express assumption of risk is unavailable as a defense to medical malpractice under New York law:

> Defendant's request for application of the assumption of risk doctrine ... is denied. The law of medical malpractice and informed consent are well-established areas of jurisprudence in N.Y. State. This case will be tried in accordance with those well-established principles, including the doctrine of comparative negligence.

Joint App. at 85–86. The court denied a similar oral motion on the first day of trial and, at the end of trial, refused to charge the jury on express assumption of risk. Joint App. at 134–35, 97–98.

The jury returned a verdict for Mrs. Schneider solely on the medical malpractice claim, and awarded $1,000,000.00 and $50,000.00 to her and her husband respectively. The jury found, however, that Mrs. Schneider was 50% comparatively negligent, and both awards were thereby halved to $500,000.00 and $25,000.00. On this appeal, appellants contend that the district court erred by refusing to charge as affirmative defenses an alleged covenant not to sue and express assumption of risk, and also erred in certain evidentiary rulings. We hold that, under New York law, express assumption of risk is available as an affirmative defense to a medical malpractice action and if proved, would totally bar recovery by a plaintiff. Therefore we reverse and remand this case to the district court for a new trial of the issue of express assumption of risk.

## II. DISCUSSION

### A. *Evidentiary Rulings*

Appellants' primary assertion of error in the trial court's evidentiary rulings is that the court refused to allow evidence about the effectiveness of the Revici method of cancer treatment to be introduced at trial. In particular, appellants challenge the exclusion of patient records, and the exclusion of Dr. Revici's book entitled *Research in Physiopathology As Basis Of Guided Chemotherapy With Special Application To Cancer.*

The trial court excluded records of patients successfully treated by Dr. Revici on the grounds that the issue in medical malpractice is not whether a particular treatment is effective but whether that treatment is a deviation from accepted medical practice in the community. The trial court's statement of the law of medical malpractice is correct. *Amsler v. Verrilli,* 119 A.D.2d 786, 501 N.Y.S.2d 411 (2d Dep't 1986). However, evidence as to the effectiveness of Dr. Revici's treatment method was relevant to show that he did not make a false representation with intent

---

has cysts of the breast and that she didn't see any other doctor before me, and I knew that she lied. For this I explained to her in detail as a precaution, knowing that she was lying.

Joint App. at 849.

to defraud. *See Bankers Trust Co. v. J.V. Dowler & Co.*, 47 N.Y.2d 128, 390 N.E.2d 766, 417 N.Y.S.2d 47 (1979). Any error in excluding the patient records was clearly harmless, however, in light of the jury's finding that Dr. Revici was not liable on the claim of common law fraud. Dr. Revici's sole liability was founded on medical malpractice, which is amply supported by the record, and the evidence of the effectiveness of his treatment was not relevant to that issue.

Appellants contend that the trial judge erred in excluding Dr. Revici's text on physiopathology at trial, and argue that the text was admissible under the learned treatise exception to the hearsay rule, which provides:

■ The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

(18) *Learned treatises.* To the extent called to the attention of an expert witness upon cross examination or relied upon by him in direct examination, statements contained in published treatises ... on a subject of history, medicine, or other science or art, *established as a reliable authority by the testimony or admission of the witness* or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits.

Fed.R.Evid. 803 (emphasis supplied). Thus, Rule 803(18) explicitly requires that to qualify under the learned treatise exception, a proper foundation as to the authoritativeness of the text must be laid by an expert witness. *Tart v. McGann*, 697 F.2d 75, 78 (2d Cir.1982); *United States v. Mangan*, 575 F.2d 32, 48 (2d Cir.), *cert. denied*, 439 U.S. 931, 99 S.Ct. 320, 58 L.Ed.2d 324 (1978). Such foundation is necessary to establish the trustworthiness of the treatise as viewed by professionals in that field. Learned treatises are considered trustworthy because "they are written primarily for professionals and are subject to scrutiny and exposure for inaccuracy, with

the reputation of the writer at stake." Fed.R.Evid. 803(18) advisory committee note. Failure, therefore, to lay a foundation as to the authoritative nature of a treatise requires its exclusion from evidence because the court has no basis on which to view it as trustworthy.

■ The trial judge repeatedly instructed defense counsel on the appropriate method for laying a foundation for the introduction of Dr. Revici's text as a learned treatise: "Get some expert to come in here and testify that it is a recognized treatise as the rule requires," Joint App. at 270; "the proper question to the witness is whether that book is recognized in the medical profession as an authoritative book on the treatment of cancer," Joint App. at 696. It is apparent, however, from a review of the record that defense counsel never asked the appropriate foundation question of its expert witness, Gerhard Schrauzer. *See* Joint App. at 719–721. The district court was therefore correct in excluding the text. Moreover, even if the text qualified as a learned treatise under Rule 803(18), its admission would remain subject to a balancing of probative value against danger of prejudice under Fed.R. Evid. 403, *Apicella v. McNeil Laboratories, Inc.*, 66 F.R.D. 78, 86 (E.D.N.Y.1975); *see* Annot., 64 A.L.R.Fed. 971, 976 (1983), a balancing that would favor exclusion because of the danger of prejudice inherent in recognizing a book authored by the defendant in a medical malpractice case as a learned treatise.

Appellants also contend that inquiries into a temporary suspension of Dr. Revici's license and a twenty-year old revocation of medicaid and medicare payments to a hospital with which he was associated were improper. Appellees counter that these inquiries were relevant in determining scienter, an essential element of Mrs. Schneider's common law cause of action for fraud, *Bankers Trust Co. v. J.V. Dowler & Co.*, 47 N.Y.2d 128, 390 N.E.2d 766, 417 N.Y. S.2d 47 (1979), and therefore admissible under Rule 404(b). Rule 404(b) permits introduction of other acts or crimes to prove things other than a defendant's pro-

pensity to commit a bad act, such as motive, opportunity, and intent. In this circuit, we have adopted an inclusionary approach to the Rule: "[A]s long as the evidence is not offered to prove propensity, it is admissible." *United States v. Levy*, 731 F.2d 997, 1002 (2d Cir.1984). However, relevancy remains a threshold determination. *See United States v. Margiotta*, 662 F.2d 131, 133 (2d Cir.1981); *United States v. Benedetto*, 571 F.2d 1246 (2d Cir.1978).

■ We have difficulty in viewing a license suspension that occurred *after* the claim for fraud arose as probative of whether Dr. Revici possessed the fraudulent intent necessary to establish common law fraud. Moreover, the temporary suspension of Dr. Revici's license to practice medicine was of doubtful probative value due both to its temporary nature during a pending investigation, *see United States v. Leonardi*, 623 F.2d 746 (2d Cir.), *cert. denied*, 447 U.S. 928, 400 S.Ct. 3027, 65 L.Ed.2d 1123 (1980), and to the fact that the license suspension proceeding was precipitated by Mrs. Schneider's complaint to the licensing authority arising from the same alleged injury that was before the trial court. We agree with the district court's ruling, however, that any possibility of prejudice attached to this evidence "was cured by [defendants] having brought out that [the license] was reinstated." Joint App. at 667. Furthermore, that Dr. Revici prevailed on the fraud claim indicates that any error was harmless.

The trial court's ruling on evidence of the twenty-year old temporary suspension of medicaid and medicare payments to a drug treatment program administered by Dr. Revici is subject to a similar analysis. The trial court admitted the evidence, stating that "it goes to the plaintiff's claim of fraud." Although we are troubled by the district court's decision that the evidence was relevant, *see United States v. Dennis*, 183 F.2d 201, 231 (2d Cir.1950) (remoteness), *aff'd*, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951); *United States v. Moon*, 718 F.2d 1210, 1232 (2d Cir.1983) (lacks similarity), *cert. denied*, 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984), any prej-

udicial effect the admission may have had was minimized by Dr. Revici's subsequent testimony that the medicaid and medicare benefits were later restored.

As with the evidence of the license suspension, we note that Dr. Revici was not actually prejudiced by the district court's ruling on the suspension of benefits. Rule 103(a) of the Fed.R.Evid. states that "[e]rror may not be predicated upon a ruling which admits or excludes evidence *unless a substantial right of the party is affected ...*" (emphasis supplied). *See also* 28 U.S.C. § 2111 ("the [appellate] court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties"); Fed.R. Civ.P. 61 (error is not grounds for disturbing a verdict unless the refusal to take such action appears inconsistent with substantial justice). *See generally Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). In light of the jury determination exonerating Dr. Revici with respect to the fraud claim and the substantial independent support in the record for a finding of liability on the malpractice claim, it is apparent that no "substantial right" was affected here, *see Litton Systems, Inc. v. American Tel. & Tel. Co.*, 700 F.2d 785, 819 (2d Cir.1983), *cert. denied*, 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984), and, therefore, as error not harmful to the end result, it is not reversible. *See In re Bed & Breakfast Registry*, 791 F.2d 157 (Fed.Cir.1986).

■■ Defendants' expert witness, Gerhard Schrauzer, had testified about the nutritional value of selenium—testimony directed at negating the fraud claim against Dr. Revici. To rebut that testimony, plaintiffs called Victor Herbert, M.D., who authored two books concerning health and nutrition fads, entitled *Nutrition Cultism, Facts and Fictions* and *Vitamins and Health Foods: The Great American Hustle*, and coauthored a book entitled *The Health Robbers*, about health fraud in the United States. Dr. Herbert testified that he was a member of the National Council Against Health Fraud, and stated that its

goal was to combat "health fraud, misinformation and quackery." He defined a quack as "a person who promotes and sells unproven methods of therapy, falsely representing them to be effective." Joint App. at 867. Appellants object to the trial court's failure to strike his testimony in the following exchange:

Q: Could you tell us whether Dr. Emanuel Revici is recognized by the National Council Against Health Fraud and in what manner?

[Objection]

A: We recognize him as a quack, we recognize his treatment as snake oil. We consider him, in quotes, one of the cruelest killers in the United States.

.        .        .        .        .

Q: You said quote unquote from something. Where did that come from?

A: That comes from our book The Health Robbers.

Joint App. at 778–79. The labels applied to Dr. Revici by Dr. Herbert should not have been countenanced by the district judge. Dr. Herbert was entitled to furnish his opinion on the efficacy of Dr. Revici's treatment and on the consequences likely to befall patients who accepted it in lieu of traditional treatment. These views could have been forcefully expressed without the incendiary labels "quack" and "one of the cruelest killers." However, viewing the testimony in the context of the emphatic opinions that were properly expressed, we do not believe the failure to strike the use of inflammatory characterizations warrants reversal. The labels, though improper, added but slight impact to the force of Dr. Herbert's testimony. Fed.R.Civ.P. 61.

We have considered the other evidentiary arguments of appellants and find them to be without merit.

### B. *Covenant Not to Sue*

New York law recognizes the efficacy of a covenant not to sue in the context of medical treatment:

Specifically, where a patient voluntarily agrees to undergo an experimental and inherently dangerous surgical procedure, the parties may covenant to exempt the physician from liability for those injuries which are found to be the consequences of the non-negligent, proper performance of the procedure.... That is to say, that an experimental procedure which, because of its inherent dangers, may ordinarily be in and of itself a departure from customary and accepted practice (and thus possibly actionable as malpractice) even if performed in a non-negligent manner, may be rendered unactionable by a covenant not to sue.

*Colton v. New York Hospital*, 98 Misc.2d 957, 414 N.Y.S.2d 866, 876 (Sup.Ct.1979), and cases there cited. However, New York requires that "a covenant not to sue ... must be strictly construed against the party asserting it. Moreover, its wording must be 'clear and unequivocal.'" *Id.* at 874 (citations omitted). The form signed by Mrs. Schneider lacks the precision required by New York law.

In the first place, the form was not labeled a covenant or agreement not to sue but was instead captioned *"CONSENT FOR MEDICAL CARE."* That caption would lead most patients to believe that they were signing a form only to acknowledge informed consent, rather than forgoing the right to bring suit. Second, the one paragraph of the consent form that bears on legal liability is not "clear and unequivocal." It states: "I therefore release Dr. Emanuel Revici from all liabilities to me, including all claims and complaints by me or by other members of my family." Though this language can be interpreted to mean that the patient is agreeing not to bring suit for any consequences that may arise in the future as a result of Dr. Revici's treatment, or as a result of forgoing traditional treatment, that interpretation is not compelled. To "release ... from all liabilities" can plausibly be understood only to relinquish claims currently existing, rather than to promise not to sue in the future on claims that may subsequently arise. The ambiguous language of the form prepared by Dr. Revici stands in sharp contrast to the unequivocal language of the form enforced in *Colton*, which left no room for doubt that the patient was

knowledgeably agreeing not to sue the doctor for consequences of the procedure to be performed. The form in *Colton* included the words "COVENANT NOT TO SUE" in block capitals in the caption and the text, and made clear that it covered future claims that might arise. *Id.* at 870–71.

The district judge did not err in declining to submit the covenant not to sue issue to the jury.

### C. *Assumption of Risk*

■ An examination of the complaint reveals that appellants sufficiently pleaded assumption of risk in their Third Affirmative Defense by broadly asserting Mrs. Schneider's "culpable conduct." *Cf. Hoyt v. McCann*, 88 A.D.2d 633, 450 N.Y.S.2d 231 (2d Dep't 1982) (assumption of risk is a form of "culpable conduct"); 1B. Warren's N.Y. Negligence § 2.02[3], at 1027 (rev. 2d ed. 1980). We therefore address the district court's ruling that assumption of risk was inapplicable to this case, and the court's subsequent failure to charge the jury on express assumption of risk.

In 1975, New York adopted a comparative negligence statute eliminating contributory negligence as a total bar to recovery. Prior to adoption of the statute a plaintiff was required to be free of any negligence contributing in the slightest degree to his injury, in order to recover. The plaintiff's own negligence was viewed as an intervening cause, between the defendant's negligent act and the plaintiff's injury, which prevented any recovery. *Dowd v. New York, Ontario & W. Ry. Co.*, 170 N.Y. 459, 63 N.E. 541 (1902). *See generally Arbegast v. Board of Educ.*, 65 N.Y.2d 161, 165, 480 N.E.2d 365, 368, 490 N.Y.S.2d 751, 754 (1985).

The doctrine of assumption of risk was also a defense to an action for the recovery of damages for personal injuries, prior to the adoption of the comparative negligence statute. *Murphy v. Steeplechase Amusement Co.*, 250 N.Y. 479, 166 N.E. 173 (1929); *Ruggerio v. Board of Educ.*, 31 A.D.2d 884, 298 N.Y.S.2d 149 (4th Dep't 1969), *aff'd*, 26 N.Y.2d 849, 258 N.E.2d 92, 309 N.Y.S.2d 596 (1970).

The doctrine of assumption of risk lies in the maxim, *volenti non fit injuria.* Based as it is upon the plaintiff's assent to endure a situation created by the negligence of the defendant, it relieves the defendant from performing a duty which might otherwise be owed to the plaintiff. *McEvoy v. City of New York*, 266 A.D. 445, 447, 42 N.Y.S.2d 746, 749 (2d Dep't 1943), *aff'd*, 292 N.Y. 654, 55 N.E.2d 517 (1944). While assumption of risk, like contributory negligence, barred recovery, it was predicated on a theory of contract rather than on a theory of culpable conduct: the plaintiff's agreement, either express or implied, to absolve the defendant from responsibility. *Arbegast*, 65 N.Y.2d at 165, 480 N.E.2d at 368, 490 N.Y.S.2d at 754. "Express" assumption of risk resulted from an advance agreement that the defendant need not use reasonable care for the plaintiff's benefit. "Implied" assumption of risk, on the other hand, was founded on plaintiff's unreasonable and voluntary consent to the risk of harm from defendant's conduct with full understanding of the possible harm. *Id.* at 169, 480 N.E.2d at 371, 490 N.Y.S.2d at 757; Restatement (Second) of Torts §§ 496B, 496E.

In 1975, New York's Civil Practice Law and Rules were amended by the addition of a pure comparative negligence statute, Act of May 6, 1975, ch. 69, 1975 N.Y. Laws 94, applicable prospectively as follows:

> In any action to recover damages for personal injury, injury to property, or wrongful death, the culpable conduct attributable to the claimant or to the decedent, including contributory negligence or *assumption of risk*, shall not bar recovery, but the amount of damages otherwise recoverable shall be diminished in the proportion which the culpable conduct attributable to the claimant or decedent bears to the culpable conduct which caused the damages.

N.Y.Civ.Prac.L. & R. 1411 (McKinney 1976) (emphasis supplied). By including "assumption of risk" as culpable conduct of the plaintiff that would diminish damages proportionately, the plain language of N.Y. Civ.Prac.L. & R. 1411 seemingly abolished

assumption of risk as a complete bar to recovery. However, while the common law distinguished between express and implied assumption of risk, neither section 1411 nor its legislative history defined the phrase or discussed the difference between express and implied assumption of risk.

In accord with the plain language of the statute and the legislative intent expressed in the Report to the 1975 Legislature by the Judicial Conference of the State of New York 21–22 (Feb. 1, 1975) *reprinted in* 1975 N.Y.Laws 1485 ("it is expected that the courts will treat assumption of risk as a form of culpable conduct under this article"), commentators assumed that under the new comparative negligence statute assumption of risk was no longer a total bar to recovery, but simply diminished the amount of damages recoverable. *See* 1B Warren's N.Y. Negligence § 2.03, at 1028 (rev. 2d ed. 1980); N.Y.Civ.Prac.L. & R. 1411 practice commentary (McKinney 1976). However, the failure of the statute to define assumption of risk or to distinguish express from implied assumption of risk, and the different theoretical bases upon which assumption of risk and contributory negligence rest, suggested that express assumption of risk might not be subject to the comparative fault provisions of section 1411.

In 1985, the Court of Appeals of New York discussed section 1411 and its effect on the doctrine of express assumption of risk in *Arbegast v. Board of Educ.,* 65 N.Y.2d 161, 480 N.E.2d 365, 490 N.Y.S.2d 751 (1985). The court held that express assumption of risk would provide a complete defense, while implied assumption of risk was subsumed by N.Y.Civ.Prac.L. & R. 1411:

> CPLR 1411 requires diminishment of damages in the case of an implied assumption of risk but, except as public policy proscribes an agreement limiting liability, does not foreclose a complete defense that by express consent of the injured party no duty exists and, therefore, no recovery may be had.

*Arbegast,* 65 N.Y.2d at 170, 480 N.E.2d at 371, 490 N.Y.S.2d at 757–58 (footnote omitted). In reaching this conclusion the court reasoned that prior to enactment of the pure comparative negligence statute, the law had recognized that contractual limitations of liability did not violate public policy "except as specific statutes imposed limitations upon such agreements or interdicted them entirely." *Id.* at 169–70, 480 N.E.2d at 371, 490 N.Y.S.2d at 757 (citations omitted).

In the case before us, appellees contend that it is against public policy for one expressly to assume the risk of medical malpractice and thereby dissolve the physician's duty to treat a patient according to medical community standards. We first note that the "public policy" referred to by the *Arbegast* court is defined solely by statute, *id.,* and appellant points to no statute imposing limitations on such express agreements. Moreover, we see no reason why a patient should not be allowed to make an informed decision to go outside currently approved medical methods in search of an unconventional treatment. While a patient should be encouraged to exercise care for his own safety, we believe that an informed decision to avoid surgery and conventional chemotherapy is within the patient's right "to determine what shall be done with his own body," *Schloendorff v. Society of the New York Hospital,* 211 N.Y. 125, 129, 105 N.E. 92 (1914) (Cardozo, J.) (overruled on other grounds by *Bing v. Thunig,* 2 N.Y.2d 656, 143 N.E.2d 3, 163 N.Y.S.2d 3 (1957)). Finally, we note that in a recent post-*Arbegast* case, the Court of Appeals of New York applied the *Arbegast* distinction between express and implied assumption of risk to a medical malpractice action. In *Resnick v. Gribetz,* 66 N.Y.2d 729, 487 N.E.2d 908, 496 N.Y.S.2d 998 (1985), the defendant doctor contended that plaintiff's refusal to undergo a suggested biopsy amounted to an assumption of risk. The court, citing *Arbegast,* ruled that the trial court erred in charging the jury that assumption of risk would bar recovery when no evidence supported a finding of express, as opposed to implied, assumption of risk.

While we do not determine, in the case before us, whether Mrs. Schneider expressly assumed the risk of Dr. Revici's treatment, we hold that there existed sufficient evidence—in the language of the Consent for Medical Care form that she signed, and in testimony relating to specific consent informed by her awareness of the risk of refusing conventional treatment to undergo the Revici method—to allow the jury to consider express assumption of risk as an affirmative defense that would totally bar recovery. It was therefore error for the district court to deny the defendants' request for a jury charge on the issue, and we reverse and remand for that reason.

### III. CONCLUSION

To summarize, we hold that the district court erred in refusing to charge the jury with the affirmative defense of express assumption of risk, and therefore reverse the judgment and remand the case to the district court for a new trial limited to the issue of assumption of risk.