**BENICORP INSURANCE COMPANY,**
**Plaintiffs,**

v.

**NATIONAL MEDICAL HEALTH CARD SYSTEMS, INC., et al., Defendants.**

**No. 05 CIV.7540(VM).**

United States District Court,
S.D. New York.

Aug. 28, 2006.

330

Linda J. Cahn, Esq., The Cahn Law Firm, Morristown, NJ, Paul A. Scrudato, Esq., Schiff Hardin, LLP, New York City, Darren VanPuymbrouck, Esq., Lawrence Hoffman, Esq., Schiff Hardin, LLP, Chicago, IL, for Plaintiffs.

Mark A. Robertson, Esq., Fullbright & Jaworski, LLP, New York City, for Defendants.

## DECISION AND ORDER

MARRERO, District Judge.

### I. BACKGROUND

By Order dated August 4, 2006, Magistrate Judge Debra Freeman, to whom this matter had been referred for pretrial supervision, issued a Report and Recommendation (the "Report"), a copy of which is attached and incorporated herein, recommending that the Court deny both the motion of defendant National Medical Card systems, Inc. to enforce a purported

settlement agreement in connection with this action, and the cross-motion of plaintiff Benicorp Insurance Company for an award of costs regarding this proceeding. Neither party filed objections to the Report, although the time to do so expired on August 21, 2006. For the reasons stated below, the Court adopts the Report in its entirety.

## II. STANDARD OF REVIEW

A district court evaluating a Magistrate Judge's report may adopt those portions of the report to which no "specific, written objection" is made, as long as the factual and legal grounds supporting the findings and conclusions of the recommendations are not clearly erroneous or contrary to law. See Fed.R.Civ.P. 72(b); Thomas v. Arn, 474 U.S. 140, 149, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); Greene v. WCI Holdings Corp., 956 F.Supp. 509, 513 (S.D.N.Y. 1997). The Court is not required to review any portion of a Magistrate Judge's report that is not the subject of an objection. See Thomas, 474 U.S. at 149, 106 S.Ct. 466. A district judge, after considering any objections by the parties, may accept, set aside, or modify, in whole or in part, the findings and recommendations of the Magistrate Judge. See Rule 92.

## III. DISCUSSION

The Court finds that the facts set forth in the Report are supported by the record, and thus incorporated herein by reference, and that there is nothing clearly erroneous or contrary to law in any of the Report's factual findings or legal conclusions. Ac-cordingly, the Court adopts the Report in its entirety.

## IV. ORDER

For the reasons discussed above, it is hereby

**ORDERED** that the Report and Recommendation of Magistrate Judge Debra Freeman dated August 4, 2006 (Docket No. 41) is adopted in its entirety. The motion of defendant National Medical Health Card Systems to enforce a purported settlement of this action (Docket No. 29) is denied, and the cross-motion of plaintiff Benicorp Insurance Company for an award of costs in connection with this matter is similarly denied.

**SO ORDERED.**

## REPORT AND RECOMMENDATION

FREEMAN, United States Magistrate Judge.

This matter is before the Court on a motion by defendant, National Medical Health Card Systems, Inc. ("NMHC"),[1] to enforce its purported out-of-court settlement agreement with plaintiff Benicorp Insurance Company ("Benicorp"). Benicorp has opposed the motion and cross-moved for costs. For the reasons discussed below, I recommend that both the motion and cross-motion be denied.

### BACKGROUND

**A. Benicorp's Complaint**

Plaintiff Benicorp is a health and life insurance company providing, inter alia,

---

**1.** On October 26, 2005, plaintiff voluntarily dismissed the individual defendants from this action (Dkt. 16), in an apparent effort to facilitate settlement of the action with NMHC (see Declaration of Mark A. Robertson in Support of NMHC's Motion To Enforce Settlement Agreement, dated Apr. 21, 2006 ("Robertson Decl."), Ex. 1 at 1; see also Declaration of Darren VanPuymbrouck in Opposition to NMHC's Motion To Enforce a Purported Settlement Agreement and in Support of Plaintiff's Cross–Motion for Costs, dated Apr. 27, 2006 ("VanPuymbrouck Decl."), Ex. C).

prescription drug coverage to individuals employed by small businesses. (*See* Complaint, dated August 24, 2005 ("Compl."), ¶ 9; *see also* VanPuymbrouck Decl. ¶ 3.) According to the Complaint, defendant NMHC "holds itself out as a procurer of prescription drugs through a network of pharmacies and mail order facilities with which it has contractual relationships." (Compl.¶ 8.) In 2002, the parties entered into a so-called "Managerial Agreement," under which NMHC agreed to manage a prescription drug plan (the "Plan") and thereby provide prescription drugs to Benicorp's insureds. (Compl.¶¶ 10–11.) The Managerial Agreement specified how Benicorp would be charged by NMHC for the drugs provided to insureds under the Plan (*see id.* ¶¶ 12–13), and obligated NMHC to pass on to Benicorp a specified percentage of drug manufacturer rebates that NMHC received in connection with its procurement of the drugs (*see id.* ¶ 20).

In August 2005, Benicorp commenced this action, claiming, *inter alia,* that NMHC had breached various obligations owed to Benicorp under the parties' Managerial Agreement. In particular, Benicorp claimed that NMHC had systematically overcharged Benicorp for prescription drugs dispersed to Benicorp's insureds through the network of pharmacies with which NMHC had preexisting contractual relationships. (Compl.¶¶ 18–19.) Further (and of most relevance to this motion), Benicorp alleged that NMHC had "systematically and intentionally withheld rebate monies due and owing to Benicorp." (*Id.* ¶ 21.)

**B.   *The Parties' Settlement Negotiations***

It is undisputed that, shortly after commencing this action, Benicorp offered to settle the case for $1 million, an amount greater than the damages amount speci-

fied in its Complaint. (Robertson Decl. ¶ 1; *see also* Compl. ¶¶ 44, 49, 57, 64, and 69 (reiterating, for each Count of the Complaint, that Benicorp had suffered damages of "at least $700,000").) When NMHC's counsel, Mark A. Robertson, Esq. ("Robertson") asked why Benicorp's settlement demand exceeded its only pleaded damages claims, Benicorp's counsel, Darren VanPuymbrouck, Esq. ("VanPuymbrouck"), apparently explained that a settlement would have to take into account Benicorp's attorneys' fees and also rebate amounts that Benicorp was owed. (Robertson Decl. ¶ 1; *see also* VanPuymbrouck Decl. ¶ 18.)

Robertson seems to suggest that, from this explanation, he was led to believe that Benicorp wished to settle *all* potential rebate claims by Benicorp, whether such claims were for rebates that NMHC had allegedly wrongfully withheld from Benicorp in the past (as pleaded in the Complaint), or were claims that might arise in the future, in connection with rebate payments that had not yet become due to Benicorp because NMHC, itself, had not yet received the rebates from the drug manufacturers. (*See* Robertson Decl. ¶ 1; *see also* VanPuymbrouck Decl. ¶¶ 17–18.) VanPuymbrouck, however, states that, in his conversation with Robertson, he was explicit that he was referring to the previously withheld rebates that were the subject of the Complaint, and that the reason for increasing the settlement demand over the damages estimated in the Complaint was that, without discovery, Benicorp was not able to quantify the amounts that had been withheld. (VanPuymbrouck Decl. ¶ 18.) VanPuymbrouck also states that, at about the time that Benicorp filed its Complaint, he separately spoke to Robertson about NMHC's ongoing obligation to pay future rebates as they became due, and that Robertson assured him that NMHC

would meet its contractual obligations in that regard. (*Id.* ¶ 13.)

Regardless of what was actually said between counsel in August 2005 or in the weeks thereafter, it is also undisputed that, on October 26, 2005, in connection with the parties' settlement discussions, VanPuymbrouck followed up with a letter to NMHC, setting out Benicorp's position as to NMHC's potential exposure in the litigation. (Robertson Decl., Ex. 1.) The letter reflected Benicorp's view that, factoring in the possibility of treble damages on Benicorp's RICO claim, NMHC faced a potential total exposure in the litigation of over $3.5 million, including $375,000 (before any trebling) on Benicorp's claim for "withheld rebates." (*Id.*) In the letter, Benicorp urged NMHC to take this damages analysis into account "in formulating [its] settlement offers in this case." (*Id.* at 2.) Benicorp's letter contains no indication that any settlement of the case should also include an advance payment for future rebates, and NMHC offers no explanation as to why it may have believed that the "withheld rebates" referred to in this letter included rebate payments not yet due and not covered by the lawsuit.

After Benicorp laid out its damages analysis, the parties continued to discuss settlement, and, at some point, counsel appear to have agreed on a figure of $625,000 to settle the action. (Robertson Decl. ¶ 3; *see also* VanPuymbrouck Decl. ¶ 25.) Benicorp asserts that this figure was never intended to include any claim for future rebates, as no such claim was included in the Complaint (or in Benicorp's October letter assessing NMHC's litigation exposure), and as it was Benicorp's understanding that NMHC had separately agreed to pay such rebates when they eventually became due. (VanPuymbrouck Decl. ¶¶ 13–14.) NMHC, however, takes the position that the agreed figure of $625,000 was in fact intended to settle all rebate claims, and that the parties also orally agreed that Benicorp would provide NMHC with a "general release," meaning (according to NMHC) a release that would cover all such claims, whether past or future.

In any event, on January 4, 2006, Benicorp's counsel sent a "comfort letter" to NMHC's counsel, seeking to confirm NMHC's willingness to settle the case for $625,000. (Robertson Decl., Ex. 3.) The letter, which was signed by VanPuymbrouck, provided a space for it to be counter-signed by Robertson. (*See id.*) On January 23, 2006, VanPuymbrouck also sent NMHC a proposed written settlement agreement, which provided for a settlement amount of $625,000 and, *inter alia*, a release by Benicorp of all claims that Benicorp and its parent corporation "have asserted or could, shall, or may have asserted against [NMHC] arising from or related in any manner to the Parties July 1, 2002 Managerial Agreement ...." (Robertson Decl., Ex. 4.) The proposed release did not specifically state whether it was (or was not) intended to cover future contract claims, as well as already-existing claims.

For about three weeks, NMHC apparently did not respond in writing to Benicorp's comfort letter or the proposed settlement agreement. At some point during this period, Lawrence H. Heftman, Esq. ("Heftman"), an attorney associated with VanPuymbrouck's law firm, called Robertson and asked why NMHC had not signed and returned the comfort letter. (Declaration of Lawrence H. Heftman in Opposition to NMHC's Motion To Enforce a Purported Settlement Agreement and in Support of Plaintiff's Cross–Motion for Costs, dated Apr. 28, 2006 ("Heftman Decl."), ¶ 3.) According to Heftman, "Robertson stated that [NMHC] had not

agreed to sign the comfort letter yet and could not sign it until [NMHC's] financial disclosure period ended." (*Id.*) In his Declaration, VanPuymbrouck similarly asserts that NMHC made "explicit and repeated statements to Benicorp, in late December 2005 and early January 2006, that NMHC could not—and would not—agree to any settlement with Benicorp because NMHC did not want to incur any disclosure obligations concerning Benicorp's lawsuit or its settlement before NMHC finalized its upcoming SEC filing." (Van-Puymbrouck Decl. ¶ 24.) [2]

Finally, on the morning of January 26, 2006, at VanPuymbrouck's direction, Heftman sent Robertson an e-mail message "to follow up on the comfort letter and proposed settlement agreement." (*See* Heftman Decl. ¶ 5 and Ex. A.) The e-mail noted that Benicorp was "extremely anxious that [it] ha[d] not received the original signed comfort letter back" and asked that Robertson contact VanPuymbrouck or Heftman "as soon as possible regarding the status of the comfort letter and any reactions to the settlement agreement." (Robertson Decl., Ex. 5.) The e-mail further noted that Benicorp had instructed its counsel to refile Benicorp's complaint against the individual defendants (*see* n. 1, *supra* ), if Benicorp did not "have a funded settlement agreement by February 7, our agreed upon date" (*see* Robertson Decl., Ex. 5).

VanPuymbrouck states that, on January 26, 2006, after this e-mail was sent, he was advised by Benicorp that it had not received a rebate payment from NMHC that it had expected to receive that month, in accordance with NMHC's ongoing contractual requirement to make rebate payments to Benicorp as the rebates were received from the drug manufacturers. (VanPuymbrouck Decl. ¶ 30.) "Accordingly," VanPuymbrouck states, "Benicorp's management provided me with a very conservative estimate of future rebates that it expected to receive and made clear that I should communicate to NMHC that Benicorp would require that all future rebates be paid at the time that Benicorp settled its lawsuit with NMHC for $625,000 rather than await NMHC's receipt of those monies at some indeterminate time in the future." (*Id.*)

According to VanPuymbrouck, he then called Robertson on the afternoon of January 26th, and told him that "Benicorp had conservatively estimated future rebates at $274,890 and insisted upon receiving these monies at the same time that NMHC paid Benicorp $625,000 to settle the lawsuit." (*Id.* ¶ 31.) Based on VanPuymbrouck's account of the call, Robertson reacted badly, telling VanPuymbrouck that NMHC had no intention of paying any additional rebate monies, and "angrily" hanging up the phone on VanPuymbrouck. (*Id.*) Robertson does not deny that this conversation took place, but provides a less colorful account of what transpired. Even according to Robertson, however, an issue was raised on the call as to whether the release contained in the proposed settlement agreement "covered rebate payments or not" (Robertson Decl. at ¶ 8); Robertson concedes that he was told by VanPuymbrouck on the call that "Benicorp did not believe that the rebate payments were in-

---

2.  In response to this recounting of events by Benicorp's counsel, NMHC's Chief Legal Officer and Corporate Secretary, Jonathan Friedman, Esq. ("Friedman"), acknowledges that he told VanPuymbrouck that NMHC "wanted to pay the settlement in February of 2006," but states that this desire "had nothing to do with the disclosure of the settlement or the lawsuit and instead had to do with the date when the settlement payment would be entered on NMHC's financial books." (Second Declaration of Jonathan Friedman in Support of NMHC's Motion To Enforce Settlement Agreement, dated May 2, 2006.)

cluded" (*id.*). Nonetheless, taking the position that the draft release language was broad enough to cover all rebate payments, whether past or future, and finding that language to be consistent with his own belief as to the scope of the parties' agreement, Robertson quickly signed the comfort letter and faxed it back to VanPuymbrouck about an hour later, together with the proposed settlement agreement, to which Robertson made only minor changes. (*See id.* ¶¶ 7–8 and Ex. 6; *see also* VanPuymbrouck Decl. ¶ 33 and Exs. G, H.)

Although no party or counsel signed the proposed settlement agreement (*see* Robertson Decl., Ex. 6 at 5–6; *see also* Plaintiff Benicorp's Memorandum of Law in Opposition to NMHC's Motion To Enforce a Purported Settlement Agreement and in Support of Plaintiff's Cross–Motion for Costs, dated Apr. 28, 2006 ("Benicorp Mem."), at 18), NMHC now asserts that its counsel's return of the signed comfort letter was itself sufficient to constitute a written "acceptance" of Benicorp's outstanding "offer" to settle all claims, including both past and future rebate claims, for the sum of $625,000.

Benicorp, for its part, contends that, to the extent NMHC has asserted that future rebate payments were to be included in the parties' settlement and release, then the parties did not have, and never had, a deal. On this point, VanPuymbrouck sent a letter to Robertson on January 31, 2006, stating:

> By this letter, Benicorp hereby revokes and repudiates any prior proposed settlement agreement or comfort letter *insofar as [NMHC] now claims that those documents were intended to settle the claims raised in the above litigation and relieve [NMHC] of its obligation under the parties' Managerial Agreement to pay rebates that will come due*

*in the near future.* [NMHC's] recent pronouncement that it will not pay rebates for the fourth quarter of 2004 and 2005 represents an anticipatory breach that was heretofore unknown by Benicorp and which was not the subject matter of the above litigation. Therefore, Benicorp hereby demands that [NMHC] honor its obligation to pay these rebates as they become due.

(Robertson Decl., Ex. 7 (emphasis added).)

## *DISCUSSION*

### I. *NMHC'S MOTION TO ENFORCE THE PURPORTED SETTLEMENT AGREEMENT*

█ A " 'district court has the power to enforce summarily, on motion, a settlement agreement reached in a case that was pending before it.' " *Cruz v. Korean Air Lines Co.*, 838 F.Supp. 843, 845 (S.D.N.Y.1993) (quoting *Meetings & Expositions, Inc. v. Tandy Corp.*, 490 F.2d 714, 717 (2d Cir.1974)). A party seeking to enforce a purported settlement agreement has the burden of proof to demonstrate that the parties actually entered into such an agreement. *See Lightwave Techs., Inc. v. Corning Glass Works*, 725 F.Supp. 198, 200 (S.D.N.Y.1989). As settlement agreements are contracts, they must be construed according to general principles of contract law. *Red Ball Interior Demolition Corp. v. Palmadessa*, 173 F.3d 481, 484 (2d Cir.1999).

### A. *Choice of Law*

█ As an initial matter, this Court must determine which jurisdiction's law governs this dispute. A federal court sitting in diversity must apply the choice of law rules of the state in which it is located. *Schwimmer v. Allstate Ins. Co.*, 176 F.3d 648, 650 (2d Cir.1999) (citations omitted). Although the parties have not addressed the issue, and the parties' briefs assume

that New York law controls, there is a question as to which state's substantive law should be applied here, as the proposed settlement agreement at the heart of this dispute contains a choice-of-law clause. *See Med. Research Assocs., P.C. v. Medcon Fin. Servs.*, 253 F.Supp.2d 643 (S.D.N.Y.2003) (discussing effect of choice-of-law clause where parties have assumed other law controls). "The validity of a contractual choice-of-law clause is a threshold question that must be decided not under the law specified in the clause, but under the relevant forum's choice-of-law rules governing the effectiveness of such clauses." *Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 332 (2d Cir.2005). Therefore, this Court must apply New York law to determine the validity of the choice-of-law clause contained in the proposed settlement agreement.

■ "New York law is clear in cases involving a contract with an express choice-of-law provision: Absent fraud or violation of public policy, a court is to apply the law selected in the contract as long the state selected has sufficient contacts with the transaction." *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir.2000) (citing *Int'l Minerals and Res., S.A. v. Pappas*, 96 F.3d 586, 592 (2d Cir. 1996)); *see Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 50 (2d Cir.2004) ("[A] choice-of-law clause in a contract will apply to disputes about the existence or validity of that contract." (citing *Int'l Minerals*, 96 F.3d at 592 (applying an English choice-of-law clause to an issue of contract formation))); *see also Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26, 32 n. 3 (2d Cir.2001) (applying law specified in choice-of-law clauses to questions relating to contract formation). Here, the choice-of-law clause in the proposed settlement

agreement states that the agreement shall be governed by the substantive law of the State of Indiana. (*See* Robertson Decl., Ex. 6 at 5, ¶ 14.) Yet even if it could be shown that the proposed settlement agreement was, in fact, an enforceable contract, further inquiry into the validity of the choice-of-law clause would be necessary. This is because the copy of the proposed settlement agreement that Robertson returned to VanPuymbrouck on January 26, 2006 contains a handwritten note in the margin next to the choice-of-law clause that states: "Previous agreement NY, but we could live with Indiana." (*See id.* at 5.) Presumably, this note was written by Robertson. While this note could, arguably, be construed to indicate Robertson's acceptance of the Indiana choice-of-law clause, it more reasonably suggests that Robertson intended for the choice-of-law clause to be subject to further discussion. If, as it appears, there was no mutual assent to the choice-of-law clause in the proposed settlement agreement, then the choice-of-law clause should not be given effect. *Cf. Pray v. Oughtred & Harrison*, No. 98 Civ. 0599(JGK), 1999 WL 173591, at *5–6, 1999 U.S. Dist. LEXIS 5287, at *14–15 (S.D.N.Y. Mar. 26, 1999) (finding forum selection clause unenforceable where it could not be considered a term that was agreed to by the parties).

■ Where no choice-of-law clause governs, the next step under New York choice of law rules would be to "undertake 'grouping of contacts' analysis to determine the ... jurisdiction [that has] the 'most significant relationship to the transaction and parties.'" *IBM v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir.2004) (quoting *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 84 N.Y.2d 309, 618 N.Y.S.2d 609, 642 N.E.2d 1065, 1068 (1994)). Here, however, such an analysis is unnecessary because the parties' briefs

assume that New York law controls and "such 'implied consent ... is sufficient to establish choice of law.'" *Krumme v. WestPoint Stevens Inc.,* 238 F.3d 133, 138 (2d Cir.2000) (quoting *Tehran–Berkeley Civil & Envtl. Engrs and Tippetts–Abbett–McCarthy–Stratton,* 888 F.2d 239, 242 (2d Cir.1989)). Therefore, I recommend that the Court apply New York law this dispute.

**B.** *Enforceability of the Purported Agreement*

■ To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound. *See, e.g., Register.com, Inc. v. Verio, Inc.,* 356 F.3d 393, 427 (2d Cir.2004) (applying New York law). The fundamental basis of a valid, enforceable contract is a meeting of the minds of the parties, and, if there is no meeting of the minds on all essential terms, there is no contract. *Schurr v. Austin Galleries of Ill.,* 719 F.2d 571, 576 (2d Cir.1983) (internal quotation marks and citation omitted) (applying New York law). Whether there has been a meeting of the minds on all essential terms is a question of fact that must be resolved by analyzing the totality of the circumstances. *See United States v. Sforza,* 326 F.3d 107, 116 (2d Cir.2003); *see also Bazak Int'l Corp. v. Tarrant Apparel Group,* 378 F.Supp.2d 377, 389 (S.D.N.Y.2005) ("To determine the presence of mutual assent, ... [t]he totality of parties' acts, phrases and expressions must be considered, along with the attendant circumstances, the situation of the parties, and the objectives they were striving to attain." (internal quotation marks and citations omitted)). If the Court finds substantial ambiguity regarding whether both parties have mutually assented to all material terms, then the Court can neither find, nor enforce, a contract. *See Schurr,* 719 F.2d at 576; *see also Missigman v. USI*

*Northeast, Inc.,* 131 F.Supp.2d 495, 506 (S.D.N.Y.2001) ("If a contract is not reasonably settled in its material terms, there can be no legally enforceable contract."); *Express Industries and Terminal Corp. v. New York State Dep't of Transp.,* 93 N.Y.2d 584, 693 N.Y.S.2d 857, 715 N.E.2d 1050, 1053 (1999) ("To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." (citation omitted)).

■ The question for the Court is whether NMHC has satisfied its burden of demonstrating that the parties had a "meeting of the minds" as to all material terms of a settlement agreement. In particular, the issue here is whether the parties had a common, mutual understanding as to the scope of the release that Benicorp was prepared to offer in exchange for NMHC's payment of $625,000. *See Forden v. Squibb,* 63 Fed.Appx. 14, 16 (2d Cir.2003) (affirming district court's ruling that, since there "had been no agreement on a material term—i.e. the release—no enforceable settlement had been reached"); *see also Cruz v. OneSource Facility Servs.,* No. 03 Civ. 8233(LAP), 2005 WL 2923517, at *3, 2005 U.S. Dist. LEXIS 26688, at *10 (S.D.N.Y. Nov. 4, 2005) ("[S]ettlement agreement is not complete where the parties cannot finalize general release language."); *Dittmann v. Dyno Nobel, Inc.,* 97–CV–1724, 2000 U.S. Dist. LEXIS 1360, at *7 (N.D.N.Y. Feb. 10, 2000) (finding that no contract existed because there was no meeting of the minds regarding the meaning of an exclusionary clause in a release).

NMHC argues that, by returning the counter-signed comfort letter on January 26, 2006, together with the proposed settlement agreement showing only minor

changes, NMHC "accepted" Benicorp's settlement offer. (*See* Memorandum of Law in Support of Defendant's Motion To Enforce Settlement, dated Apr. 21, 2006 ("NMHC Mem."), at 5, 8.) Further, NMHC asserts that Benicorp's e-mail of that morning made plain that the offer would remain open until February 7, 2006, and thus NMHC's acceptance was prior to the expiration of the offer. (*See id.* at 5.) NMHC also asserts that its acceptance was prior to NMHC's written "revocation" of its offer on January 31, 2006. (*See id.* at 6.) Accordingly, NMHC contends that its acceptance was valid and gave rise to an enforceable agreement. As for the terms of that agreement, NMHC argues that the "objective" evidence of the parties' intent—*i.e.*, the proposed written settlement agreement itself—unequivocally shows that Benicorp agreed to a release of all rebate claims, including existing claims and claims that had not yet arisen, and that the parties thus had a "meeting of the minds" on that issue. (*See id.* at 8.)

These arguments by NMHC, however, ignore a critical point in the parties' dealings. The single most telling aspect of the record is that, prior to NMHC's return of the counter-signed comfort letter and the marked-up proposed settlement agreement, counsel had a conversation in which Benicorp's counsel explicitly alerted NMHC's counsel to the fact that, in Benicorp's view, the proposed release was not intended to cover all rebate claims. Despite counsel's differing accounts as to what transpired between them both before and after that point, this key aspect of their January 26, 2006 conversation is not in dispute. In his own Declaration, NMHC's counsel concedes that he was informed that "Benicorp did not believe the rebate payments were included [in the proposed release]," while he, himself, "believ[ed] that the release language cover[ed] the rebate payments." (Robertson Decl.

¶ 8.) NMHC thus admits that, before it purportedly "accepted" Benicorp's "offer," it was aware that the parties had very different understandings as to the scope of Benicorp's proffered release, and hence lacked a common intent on a material term of the supposed agreement. *See Dittmann*, 2000 U.S. Dist. LEXIS 1360, at *10 (finding release unenforceable where, at the time the parties signed the release, each party understood the scope of the release differently); *see also id.* at *8–9 (" 'Where the offeror, using ambiguous language, reasonably means one thing and the offeree reasonably understands differently, there is no contract.' ") (quoting *Brands v. Urban*, 182 A.D.2d 287, 587 N.Y.S.2d 698, 700 (2d Dep't 1992)); Restatement (Second) of Contracts § 20(1) (1981) ("There is no manifestation of mutual assent to an exchange if the parties attach materially different meanings to their manifestations and . . . each party knows or each party has reason to know the meaning attached by the other.").

▆▆▆ Moreover, despite NMHC's argument to the contrary, there is nothing about the draft release language itself that, as an objective matter, demonstrates that Benicorp actually intended to relinquish future claims. As a threshold matter, although Benicorp's proposed release does not contain language making explicit that it would only cover claims existing as of the date of the release, courts have ordinarily held a party's release to be "inapplicable to conduct subsequent to the execution of the release." *Info. Superhighway, Inc. v. Talk Am., Inc.*, 274 F.Supp.2d 466, 471 (S.D.N.Y.2003); *see also Melwani v. Jain*, No. 02 Civ. 1224(DF), 2004 WL 936814, at *6, 2004 U.S. Dist. LEXIS 7590, at *20 (S.D.N.Y. Apr. 29, 2004) ("A general release is a release that covers 'all claims and demands due *at the time of its execution*.' ") (quot-

ing *Kaul v. Hanover Direct, Inc.,* 296 F.Supp.2d 506, 517 (S.D.N.Y.2004) (emphasis added)). This is because, by its nature, "[a] 'release' is a provision that intends a present abandonment of a known right or claim. By contrast, a covenant not to sue also applies to future claims and constitutes an agreement to exercise forbearance from asserting any claim which either exists or which may accrue." *McMahan & Co. v. Bass,* 250 A.D.2d 460, 673 N.Y.S.2d 19, 21 (1st Dep't 1998). Any covenant not to sue, however, "must be strictly construed against the party asserting it. Moreover, its wording must be clear and unequivocal." *Schneider v. Revici,* 817 F.2d 987, 993 (2d Cir.1987) (internal quotation marks and citations omitted). Applying these principles, an agreement "[t]o 'release ... from all liabilities' can plausibly be understood only to relinquish claims currently existing, rather than to promise not to sue in the future on claims that may subsequently arise." *Id.* In this case, the settlement agreement language proposed by Benicorp—providing for the release of all contract-related claims that Benicorp or its corporate parent "have asserted or could, shall, or may have asserted" against NMHC—is far from a "clear and unequivocal" covenant by Benicorp to relinquish claims that had not yet arisen as of the date of the release. *See Info. Superhighway,* 274 F.Supp.2d at 470–71 (finding that language releasing "all claims ... that ... could have been asserted" did not unambiguously release future claims).

NMHC appears to take the position that, because Benicorp's proposed release refers to all contract-related claims, it should necessarily be read to cover both existing and future contract-related claims. This proposition, however, is not supported by any authority cited by NMHC; in fact, the only cases NMHC does cite with respect to the meaning of release language (*see* NMHC Mem. at 9–10), have nothing to do with the issue of future claims. *See Great American Trucking Co. v. Swiech,* 267 A.D.2d 1068, 700 N.Y.S.2d 632 (4th Dep't 1999) (holding that an implied covenant of non-solicitation was covered by a release that discharged defendant from all covenants); *Goldome Corp. v. Wittig,* 221 A.D.2d 931, 634 N.Y.S.2d 308 (4th Dep't 1995) (holding that a general release covering "all covenants ... whatsoever, in law or in equity" covered an implied covenant); *Corvino v. CBS, Inc.,* 92 A.D.2d 536, 459 N.Y.S.2d 99 (2d Dep't 1983) (holding that plaintiff's claim that he was fraudulently induced into entering into a contract was released in a subsequent settlement of contract claims). In any event, even if NMHC's expansive reading of the proposed release were reasonable, that would merely show that reasonable parties could differ as to the meaning of the proposed release, not that Benicorp's stated understanding to the contrary was unsupportable. *Cf. Info. Superhighway,* 274 F.Supp.2d at 470–71 (finding release "ambiguous," where it had "two plausible meanings," such that it could have been construed to cover only existing claims or also future claims). If what NMHC has shown is "ambiguity" in the scope of the proposed release, then it has not satisfied its burden to demonstrate an unambiguous, and thus enforceable, settlement agreement.

NMHC is also not persuasive in its fallback argument that, regardless of the parties' differing understandings of the written settlement proposal, they had reached an earlier oral settlement agreement that should be enforced by the Court. NMHC faces a particularly heavy burden to demonstrate the existence of an oral agreement, *see Highland Capital Mgmt., L.P. v. Schneider,* No. 02 Civ. 8098(PKL), 2005 WL 1765711, at *11, 2005 U.S. Dist. LEXIS 14912, at *37 (S.D.N.Y. July 26, 2005),

and, if anything, there is more ambiguity in the record as to the earlier oral statements and understandings of the parties than there is as to later events. Indeed, even the statements made by NMHC's own counsel on its motion are vague as to when an alleged oral agreement was purportedly reached, what was said to give rise to that agreement, and how NMHC's acceptance was manifest.

Finally, nothing in the written record makes it "objectively" clear that Benicorp ever orally agreed to forego future rebate payments as they became due. Benicorp's October 26, 2005 letter, laying out its view of NMHC's potential litigation exposure and suggesting that NMHC consider Benicorp's analysis in formulating settlement offers, referred only to NMHC's exposure for "withheld rebates" (*see* Robertson Decl., Ex. 1 at 1), which, given its ordinary meaning, would not include payments that were not yet due.[3] Further, to the extent NMHC argues that Benicorp's January 4, 2006 comfort letter was intended to "confirm" the parties' earlier, oral agreement to settle the action (*see* Robertson Decl., Ex. 3), that comfort letter must be read in conjunction with Benicorp's written settlement proposal that followed, in order to understand what it was that Benicorp was seeking to confirm. As discussed above, Benicorp's written proposal does not establish that Benicorp ever intended to relinquish future claims. Moreover, as Benicorp notes (*see* Benicorp Mem. at 14 n. 4), its proposed written agreement contained a merger clause, making plain that Benicorp intended any prior oral agreements to be superceded by, and merged into, a written agreement.

On the record presented, this Court cannot find that NMHC has satisfied its burden to demonstrate that the parties mutually assented to all material terms of a settlement agreement, and I therefore recommend that NMHC's motion to enforce the parties' purported settlement agreement be denied.

## II. BENICORP'S CROSS–MOTION FOR COSTS

▓▓▓▓ In its cross-motion, Benicorp asserts that NMHC has "misrepresented numerous facts, omitted critical facts, and cited legal cases that are both inapposite and that directly contradict its argument." (Benicorp Mem. at 17.) Although Benicorp states that, "[d]ue to the constrained briefing schedule" on NMHC's motion to enforce the purported settlement, it was "not in a position to file a separate motion for sanctions under Rule 11" (*id.*), it nonetheless argues that sanctions are appropriate, and requests that the Court award it the costs of responding to NMHC's motion (*see id.* at 17–19.)

Rule 11 of the Federal Rules of Civil Procedure provides, *inter alia,* that, by submitting a signed pleading, motion or other paper to the Court, a party or attorney "is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, ... [the] legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law ... [and] the allegations and other factual contentions have evidentiary support." Fed.R.Civ.P. 11(b)(3). Where the Court finds that a party, without reason-

---

**3.** Similarly; when Benicorp wrote to NMHC on October 6, 2005, agreeing to dismiss the individual defendants from the case (*see* n. 1, *supra*), it noted that the dismissal would be "[i]n the interest of fostering prompt return of funds owed to Benicorp" (VanPuymbrouck Decl., Ex. C), which logically refers to previously withheld amounts.

able inquiry, has made an unwarranted legal or factual contention in a signed submission to the Court, the Court may impose sanctions under the Rule. *See* Fed. R.Civ.P. 11(c).

A motion for sanctions under Rule 11, however, must "be made separately from other motions or requests" and must "describe the specific conduct alleged to violate subdivision (b)" of the Rule. Fed. R.Civ.P. 11(c)(1)(A). Moreover, the Rule contains a "safe harbor" provision, affording protection to a party that voluntarily withdraws its challenged statement after receiving notice of the specific grounds for a potential sanction. Specifically, the Rule provides that a sanctions motion under the Rule must be served "but shall not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected." *Id.* A movant is required to follow this procedure, and a Rule 11 motion that is not made in compliance with this procedural aspect of the Rule is subject to denial on this basis. *See Storey v. Cello Holdings, L.L.C.,* 347 F.3d 370, 389 (2d Cir.2003); *ESI, Inc. v. Coastal Corp.,* 61 F.Supp.2d 35, 67–68 (S.D.N.Y.1999) (holding that a motion for sanctions under Rule 11 must be denied where the movant fails to comply with the mandatory "safe harbor" provision of the Rule).

Here, Benicorp has suggested no basis for its sanctions cross-motion other than Rule 11, yet it concedes that it has not followed the procedure required by the Rule. Under the circumstances, I recommend that the cross-motion be denied.

### CONCLUSION

For all of the foregoing reasons, I respectfully recommend that the Court deny both NMHC's motion to enforce the purported settlement agreement between the parties and Benicorp's cross-motion for costs.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Victor Marrero, United States Courthouse, 500 Pearl Street, Room 660, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 525, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Marrero. FAILURE TO FILE OBJECTIONS WITHIN TEN (10) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983).

August 4, 2006.